MUNICIPIO DE PONCE, demandante y recurrido, *v.* HONORABLE PEDRO ROSSELLÓ GONZÁLEZ y OTROS, demandados y peticionarios.

*Número:* CE-94-227     *Resuelto:* 29 de agosto de 1994

*Pedro A. Delgado Hernández, Procurador General, María Adaljisa Dávila, Procuradora General Auxiliar, Carlos Lugo Fiol, Subprocurador General*, abogados de El Pueblo; *Ramón E. Bauzá Higuera* y *Alberto Omar Jiménez Santiago*, abogados de la parte recurrida.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

Acude ante nos la parte demandada peticionaria para que dejemos sin efecto la orden emitida por el Tribunal Superior, Sala de Ponce, el 25 de febrero de 1994, mediante la cual se declara con lugar una solicitud de remedio provisional del Municipio de Ponce contra el Estado Libre Asociado y varias de sus agencias, y se les ordena a éstas dar fiel cumplimiento a los cinco (5) convenios suscritos entre las partes. El Municipio ha comparecido en un extenso y documentado escrito oponiéndose a la expedición del auto solicitado. Por los fundamentos que exponemos a continuación, se expide el auto de *certiorari* y se dicta sentencia para modificar la orden del tribunal de instancia a los efectos de limitarla a la transferencia inmediata de los fondos convenidos y dejar sin efecto aquella parte que ordena la transferencia de personal. Así modificada, se confirma.

## I

El caso que nos ocupa tuvo su génesis en la otorgación de cinco (5) convenios de delegación de competencia de va-

rias agencias del Estado al Municipio de Ponce, a tenor con la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (en adelante Ley de Municipios Autónomos), Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. sec. 4001 *et seq.* Las agencias concernidas son el Departamento de Transportación y Obras Públicas, el Departamento de la Vivienda, el Departamento de Recursos Naturales, la Junta de Calidad Ambiental, la Junta de Planificación y la Administración de Reglamentos y Permisos. Todos los convenios fueron suscritos por el Gobernador del Estado Libre Asociado de Puerto Rico, el Secretario o Director del departamento o agencia concernida y el Alcalde del Municipio de Ponce. En los convenios, el Gobierno Central y las agencias se comprometieron a transferir ciertos fondos y empleados al Municipio de Ponce para el período de enero de 1993 a 30 de junio de 1993 y para el Año Fiscal que comenzó el 1ro de julio de 1993.

En enero de 1993 el Municipio de Ponce comenzó a implantar las competencias que le fueron delegadas bajo los cinco (5) convenios. El 21 de mayo de 1993 el Municipio de Ponce instó una demanda en el Tribunal Superior, Sala de Ponce, contra el Estado Libre Asociado, el Gobernador Pedro Rosselló González y los cinco (5) directivos de las agencias concernidas, para exigir el cumplimiento específico de los convenios y solicitar las transferencias de los fondos según pactado y de aquel personal que no fue transferido por las agencias.

Los demandados fueron emplazados en o antes de 8 de junio de 1993 y el 21 de septiembre de 1993 el Municipio de Ponce presentó una Moción de Sentencia Sumaria, acompañando copia de los diferentes convenios, cartas y declaraciones juradas en las cuales fundamenta su posición. El 15 de octubre de 1993 los demandados contestaron la demanda negando las alegaciones principales de ésta y presentando como defensas afirmativas que los convenios son

nulos ya que al otorgarse no se cumplieron con los requisitos de ley y se suscribieron en forma contraria a derecho.

El 14 de diciembre de 1993 el Municipio de Ponce presentó "una Moción para solicitar Remedio Provisional a tenor con las Reglas 55, 56 y 57 de Procedimiento Civil de 1979". El Municipio señaló en su moción que, bajo los criterios jurisprudenciales establecidos por este Tribunal para evaluar si procede un *injunction* preliminar, el remedio solicitado debía otorgarse y, a esos efectos, solicitó que se ordenase a las partes demandadas a que en un plazo de diez (10) días depositasen en la Secretaría del Tribunal, para ser retirados por el Municipio, la totalidad de los fondos que acordaron transferir para el período del Año Fiscal que terminó el 30 de junio de 1993 y el Año Fiscal 1993–1994 a tenor con los cinco (5) convenios mencionados. A la vez, solicitó vista urgente.

El 16 de diciembre de 1993 el tribunal de instancia emitió una resolución señalando vista y discusión del remedio provisional solicitado para el 22 de diciembre de 1993. La vista se celebró el 22 y 23 de diciembre de 1993. En dicha vista el Municipio de Ponce presentó prueba testifical y documental en apoyo de su posición. La parte demandada no presentó prueba, sino que sometió su caso a base de argumentos de derecho.

El 25 de febrero de 1994 el tribunal de instancia declaró con lugar la solicitud de remedio provisional y dictó la orden siguiente:

> Se ordena al Estado Libre Asociado de Puerto Rico, a sus empleados, agentes y/o representantes así como a sus agencias e instrumentalidades: Departamento de Transportación y Obras Públicas, Departamento de la Vivienda, Departamento de Recursos Naturales, Junta de Calidad Ambiental, Junta [de] Planificación, Administración de Reglamentos y Permisos y así como cualquier otra persona que actúe bajo sus órdenes o en su representación a dar fiel cumplimiento a los términos de los Cinco (5) convenios suscritos entre las partes y en su consecuencia transferir inmediatamente los fondos y el personal establecido conforme a los mismos durante la pendencia de este

litigio y hasta su resolución final. Petición de *certiorari*, Anejo I, págs. 13–14.

Oportunamente, la parte demandada acudió ante nos mediante petición de *certiorari* para que dejemos sin efecto la orden recurrida. Aduce que no procedía remedio provisional alguno en derecho; que el remedio provisional resolvió para efectos prácticos la controversia entera sin proveer a la parte demandada oportunidad adecuada de defenderse, y que lo procedente en derecho era desestimar la demanda y remitir el asunto para conciliación y arbitraje conforme a los términos del convenio.

Visto el trasfondo procesal y fáctico del caso de autos, pasemos a discutir si el asunto que nos ocupa debía referirse a un proceso de conciliación y arbitraje compulsorio.

## II

La parte demandada peticionaria argumenta que el tribunal de instancia carecía de jurisdicción para entender en este recurso ya que los cinco (5) convenios en cuestión contienen cláusulas de arbitraje compulsorio. No le asiste la razón.

De acuerdo con la cláusula de arbitraje presente en los convenios, una disputa en torno a la *implantación* de los convenios debe ser sometida a arbitraje si ésta no ha podido solucionarse mediante un procedimiento de conciliación ante el Comisionado de Asuntos Municipales. Dicha cláusula está presente en los convenios conforme a la disposición del Art. 14.005 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4655, que requiere que todo convenio de delegación de competencias contenga, *inter alia,* el "compromiso de la agencia delegante y el municipio de someterse al procedimiento de arbitraje para la solución de *cualquier disputa relacionada con la competencia delegada*" (énfasis suplido), conforme la Ley de Arbitraje, 32 L.P.R.A. sec. 3201 *et seq.,* luego de agotado un procedi-

miento de conciliación ante el Comisionado de Asuntos Municipales establecido en la propia Ley de Municipios Autónomos.

En sus planteamientos el Estado omite señalar que cada uno de los convenios en cuestión contiene una cláusula de "Acciones Judiciales" que le brinda exclusiva competencia al Tribunal Superior, Sala de Ponce, sobre toda disputa en torno a la interpretación del convenio. Dicha cláusula dispone así:

E. *Acciones Judiciales*

Toda acción civil ordinaria o procedimiento legal especial relacionado con *la interpretación, alcance o cumplimiento de este Convenio* será de la competencia exclusiva de la Sala de Ponce del Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico. Las partes estipulan que todo procedimiento judicial que sea presentado en otra sala será trasladado a la Sala de Ponce del Tribunal de Primera Instancia. (Énfasis suplido y en el original.) Petición de *certiorari*, Anejo III, Anejo A, pág. 97.

Los cinco (5) convenios en cuestión contienen el mismo lenguaje claro e inequívoco de la citada cláusula en cuanto a que toda acción sobre la *interpretación, alcance o cumplimiento* de los convenios no solamente será objeto de adjudicación por los tribunales, sino que será de la competencia exclusiva del Tribunal Superior, Sala de Ponce. El presente caso no gira en torno a una "disputa relacionada con la competencia delegada" ni sobre "la implantación" de los convenios, sino que versa propiamente sobre la *nulidad o validez* de los cinco (5) convenios, asunto que cae fuera de la cláusula de arbitraje. La defensa afirmativa principal del Estado, desde su contestación a la demanda, ha sido que "[l]os convenios otorgados entre el Municipio de Ponce y las agencias demandadas son nulos". Petición de *certiorari*, Anejo IV, pág. 311. En el caso de autos, ni la ley ni los convenios han cerrado las puertas de los tribunales para entender en una acción en la que se deba adjudicar la va-

lidez misma de los convenios.[1] *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991).

Aclarado este aspecto de umbral, veamos si el remedio concedido por el tribunal de instancia procede en derecho.

## III

En la vista ante el tribunal a quo se acordó que solamente se discutiría la petición de remedio provisional. Por consiguiente, en su Resolución y Orden el tribunal indicó que únicamente resolvía lo concerniente a la solicitud del remedio provisional.[2] Valga enfatizar que la orden del tribunal de instancia, que otorga el remedio provisional con

---

[1] La Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (en adelante Ley de Municipios Autónomos) contiene disposiciones sobre la "Jurisdicción de los Tribunales" en su Capítulo 229, secs. 4701–4708, que, a modo de ejemplo, confieren exclusividad al Tribunal de Distrito para conocer de las infracciones a las ordenanzas municipales —Art. 15.001 (21 L.P.R.A. sec. 4701)— y al Tribunal Superior para revisar cualquier acto legislativo o administrativo de cualquier funcionario u organismo municipal que lesione derechos constitucionales de los querellantes o que sea contrario a las leyes de Puerto Rico, y para compeler el cumplimiento de deberes ministeriales por los funcionarios del municipio. Art. 15.002 (21 L.P.R.A. sec. 4702).

Nada hay en el historial legislativo de la ley que evidencie una intención del legislador de que las partes no puedan recurrir a los tribunales para que se interprete y adjudique la validez o nulidad de los convenios. Aunque hemos establecido que una cláusula de arbitraje puede ser lo suficientemente amplia como para incluir entre los asuntos que han de ser llevados a dicho foro la existencia o no de un contrato, *World Films, Inc. v. Paramount Pict. Corp.*, 125 D.P.R. 352 (1990), la cláusula de arbitraje en los convenios del caso de autos no tiene tal amplitud. Esto surge claramente no sólo del propio texto de dicha cláusula, sino de la inclusión en los convenios de la cláusula referente a "Acciones Judiciales" y su disposición en cuanto a la competencia exclusiva de los tribunales en torno a la *interpretación*, el *alcance* o *cumplimiento* de los convenios. El arbitraje, después de todo, "es un asunto contractual y no se puede obligar a una parte a someter a arbitraje una disputa que dicha parte no ha acordado someter". (Traducción nuestra.) *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 582 (1960), citado con aprobación en *World Films, Inc. v. Paramount Pict. Corp.*, supra, pág. 361 esc. 8.

[2] El juez de instancia, Hon. Miguel A. Montalvo Rosario, consignó en su resolución que en la vista "[s]e convino en que solo se discutiría la petición de Remedio Provisional y se le concedió tiempo al [E]stado para replicar por escrito la Moción de Sentencia Sumaria para estudiarla el Juez a quien el caso se le asignara posteriormente. Por ende sólo tenemos que resolver la solicitud de Remedios Provisionales". (Civil Núm. JAC93-0233, pág. 2.) Petición de *certiorari*, Anejo I, pág. 2.

carácter de *injunction* preliminar, es propiamente lo que está ante esta Curia.

■ El *injunction* preliminar es el remedio provisional que se emite en cualquier momento de un pleito, después de haberse celebrado una vista en que las partes han presentado prueba en apoyo y en oposición de tal solicitud. El propósito fundamental del *injunction* preliminar es el de mantener el status quo hasta que se celebre el juicio en sus méritos. *Sucn. Figueroa v. Hernández*, 72 D.P.R. 508 (1951). De esa forma, la orden de *injunction* preliminar, ya sea requiriendo un acto o prohibiéndolo, evita que la conducta del demandado produzca una situación que convierta en académica la sentencia que finalmente se dicte o que se le ocasionen daños de mayor consideración al peticionario mientras perdura el litigio. *Cobos Liccia v. DeJean Packing Co., Inc.*, 124 D.P.R. 896 (1989).

■ La concesión o no de un *injunction* preliminar debe determinarse a la luz de los cinco (5) criterios establecidos por este Tribunal en *P.R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200 (1975), y *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903 (1975). Estos criterios son:

(1) la naturaleza de los daños que pueden ocasionárseles a las partes de concederse o denegarse el *injunction*;

(2) su irreparabilidad o la existencia de un remedio adecuado en ley;

(3) la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo;

(4) la probabilidad de que la causa se torne académica de no concederse el *injunction*, y sobre todo,

(5) el posible impacto sobre el interés público del remedio que se solicita.

El tribunal a quo, luego de evaluar la prueba testifical y documental que desfiló ante sí, consideró los hechos particulares del caso de autos a la luz de los criterios mencionados y determinó que procedía el *injunction* preliminar contra la parte demandada. Debemos determinar si el

tribunal abusó de su discreción al sopesar los intereses en juego y emitir la orden de *injunction* preliminar.

*Naturaleza de los daños.* El Municipio de Ponce ha asumido los costos para la implantación de los convenios y además ha tenido que utilizar de sus limitados fondos municipales para cubrir gastos en concepto de salarios, beneficios marginales y otros, de los empleados que fueron transferidos mediante convenio. Es decir, el Municipio ha realizado el trabajo y ha ofrecido los servicios que el Estado, antes de los convenios, estaba obligado a hacer, y ha pagado de sus fondos por ello en todo o en parte.

Según surge de las determinaciones hechas por el tribunal de instancia, la situación fiscal del Municipio de Ponce se ha agravado con el incumplimiento por parte del Gobierno Central. No se les han renovado contratos a empleados, se considera dejar cesantes a otros y los servicios municipales básicos a la ciudadanía han sido reducidos tanto en cantidad como en calidad. Los testimonios presentados en la vista ante el tribunal a quo establecen que a partir de enero de 1993 (febrero de 1993 en el caso del convenio con el Departamento de la Vivienda y la Administración de Mejoras de Viviendas) el Municipio ha asumido los costos y gastos relacionados con la implantación de los cinco (5) convenios.([3]) Estos costos incluyen el pago de las nóminas

---

([3]) La prueba documental unida al expediente, consistente en declaraciones juradas y comunicaciones escritas, tiende a apoyar dicha determinación.

En la vista ante el tribunal de instancia la prueba testifical del Municipio de Ponce consistió de los testimonios del Sr. Ramón Anglada, Administrador Municipal Interino (*City Manager*) del Muncipio de Ponce; del Ing. Oscar Ramírez, Director de la Oficina de Permisos del Municipio de Ponce; del Sr. Héctor Avilés, Director del Departamento de Obras Públicas Municipales; del Sr. Adalberto Maldonado, Director del Departamento de Ornato del Municipio de Ponce; de la Srta. Waleska Murphy Pacheco, quien hasta septiembre de 1993 fue contadora del Programa de Rehabilitación de Vivienda en el Municipio de Ponce conocido por el nombre "Ponce en Marcha"; del Sr. Héctor Estrada, Director del Programa de Rehabilitación de Vivienda; del Sr. Jaime Zengotita, empleado del Programa de Rehabilitación de Vivienda, y del testimonio de la Sra. Ivonne Laborde, Directora de Personal del Municipio de Ponce.

En dicha vista se estipuló la autenticidad de los cinco (5) convenios en cuestión; la admisibilidad de las nóminas pertinentes de los empleados del Municipio de Ponce; un resumen detallado de las nóminas preparado por el Municipio, el cual incluye el nombre de los empleados transferidos por convenio, los salarios pagados

de los empleados transferidos, el pago de sus beneficios marginales, los gastos directos relacionados con la implantación de las competencias en cuestión, como son la compra de materiales y equipo, gastos de agua, luz, teléfono y otros, y los costos indirectos como son la prestación de servicios de apoyo administrativos, legales, de finanzas, de personal y otros servicios esenciales para que las competencias objeto de los convenios puedan ser implantadas a través de la estructura municipal. Además existe la seria amenaza de que eventualmente el Municipio de Ponce tenga que eliminar la prestación de estos servicios a la comunidad.

*Irreparabilidad de los daños o la existencia de un remedio adecuado en ley.* El Estado sostiene que el Municipio sólo ha alegado y probado que su problema es monetario y este es el daño reparable por excelencia. Alega el Estado que en la eventualidad de que el Municipio de Ponce prevalezca, recibiría lo que se solicita. Claramente, la situación no es tan simple. La prueba demuestra que la ausencia de estos fondos imposibilita el que se cumpla con la implantación de los convenios y aun cuando luego el Estado efectúe la transferencia de fondos, el remedio sería inadecuado y académico. La reducción en la cantidad y la calidad de los servicios municipales, resultante de los cesantes y de otras medidas de austeridad que de forma drástica se han tomado y que son necesarias aumentar, es un daño irreparable que no podrá ser resarcido aunque eventualmente el Gobierno Central, de prevalecer el Municipio de Ponce en el juicio en su fondo, haga las transferencias de los fondos correspondientes. Tal situación de estrechez económica ha forzado al Municipio a no renovar los

---

quincenalmente por el Municipio de Ponce según convenio hasta el 15 de diciembre de 1993 a los empleados transferidos que no continúan prestando servicios en la actualidad, los empleados transferidos que continúan prestando servicios y los salarios que devengan por quincena.

Según se señala en la resolución del tribunal de instancia, el Estado no presentó prueba, sino que sometió su caso a base de argumentos de derecho.

contratos de empleados irregulares transferidos bajo los convenios. Además, como bien ha dicho un comentarista, "[e]l mero hecho de que lo que esté en controversia sea una reclamación monetaria no excluye definitivamente el remedio de Injunction si resulta necesario para mantener el status quo e impedir que por el mero pasar del tiempo el demandante se quede sin un remedio efectivo, así como para proteger un derecho propietario amenazado por un inminente acto ilegal del demandado". D. Rivé Rivera, *Recursos Extraordinarios*, Atlanta, Darbuy Printing Co., 1989, pág. 26.

■ *Probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo.* En nuestra jurisdicción el principio rector en materia de contratos es la libertad de contratación entre las partes. Los pactos entre contratantes tienen fuerza de ley y deben ser cumplidos. Art. 1044 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2994; *García v. World Wide Entmt.* Co., 132 D.P.R. 378 (1992). El Estado es un contratante como otro cualquiera y tiene que cumplir con lo que se comprometió independientemente de los cambios en administraciones de gobierno. Esta obligación es independientemente del partido político en el poder.

Al día de hoy los mencionados convenios se presumen válidos y por lo tanto obligan con fuerza de ley hasta que se decrete su nulidad. Hasta ahora el Estado simplemente ha impugnado los convenios mediante alegaciones. Art. 1210 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3375.

De una simple lectura de los convenios se desprenden los compromisos a los que se obligó el Estado con el Municipio de Ponce. De un análisis desapasionado y exhaustivo de la prueba también se desprende el incumplimiento del Estado con dichos compromisos.

El Estado alega que no existe el deber de cumplir con los convenios hasta que el tribunal determine su validez. Con excepción del convenio de la Junta de Planificación y la

Administración de Reglamentos y Permisos, que contiene
una cláusula de revocación, todos los demás convenios con-
tienen una cláusula de incumplimiento que provee para su
resolución bajo determinadas circunstancias. Dicha cláu-
sula dispone así:

> 6–*Resolución del Convenio*
> (a) Se podrá exigir la resolución total o parcial de este Con-
> venio de conformidad con el Artículo 14.008 de la Ley de Muni-
> cipios Autónomos:
> (1) Cuando se determine, conforme a la ley, que la delega-
> ción no ha agilizado o mejorado la consecución del fin público
> que se persigue.
> (2) Cuando el Municipio contravenga normas y guías pro-
> cesales adoptadas formalmente por [*el Departamento o Agencia
> concernida*].
> (3) Cuando haya un incumplimiento de cualesquiera de
> las obligaciones principales aquí contraídas.
> (b) En caso de resolución total o parcial del Convenio, las
> facultades, deberes, funciones, responsabilidades y actividades
> delegadas revertirán al [*Departamento o Agencia concernida*] y
> previa auditoría e inventario, el Municipio devolverá los bienes
> y los fondos no utilizados, si algunos. (Énfasis en el original.)
> Petición de *certiorari*, Anejo III, Anejo A, pág. 92.

■ El Art. 14.008 de la Ley de Municipios Autónomos,
21 L.P.R.A. sec. 4658, dispone lo siguiente:

> 4658. *Delegación de competencias-Incumplimiento*
> En el convenio de delegación se establecerán con meridiana
> claridad las consecuencias por el incumplimiento de cuales-
> quiera de las partes de las obligaciones principales contraídas,
> pudiéndose disponer una penalidad económica por el incumpli-
> miento y para su resolución. En tales casos las facultades, de-
> beres, funciones, responsabilidades o actividades delegadas re-
> vertirán a la agencia delegante y previa auditoría e inventario,
> el municipio devolverá los bienes, personal y fondos transferi-
> dos no utilizados y el Gobernador podrá exigir al municipio el
> pago de la penalidad pactada.

Por otra parte, entre las disposiciones generales de di-
chos convenios (con excepción nuevamente del convenio de
la Junta de Planificación y la Administración de Regla-

mentos y Permisos) existe una cláusula de resolución unilateral del convenio que dispone así:

D. *Resolución Unilateral del Convenio*
EL MUNICIPIO tiene el derecho absoluto de terminar este Convenio en cualquier momento en que así lo estime conveniente y esta terminación unilateral por parte del MUNICIPIO no se considerará un incumplimiento o violación del Convenio. EL MUNICIPIO notificará por escrito su determinación de terminar el Convenio, y deberá especificar en su notificación el plazo a partir del cual será efectiva la terminación del Convenio. El plazo no podrá ser menor de treinta (30) días. (Énfasis en el original.) Petición de *certiorari*, Anejo III, Anejo A, pág. 96.

■ Bajo nuestro derecho contractual las partes contratantes pueden pactar para incluir en sus contratos una cláusula que le confiera a una sola de ellas la facultad de poner fin a la relación contractual sin exigir para ello otro requisito que la mera voluntad de la parte. *Camacho Arroyo v. E.L.A.*, 131 D.P.R. 718 (1992); *Flores v. Municipio de Caguas*, 114 D.P.R. 521 (1983).

En el caso de autos no opera la cláusula de resolución unilateral porque, como vimos, el único que posee tal facultad —y de manera absoluta— es el Municipio de Ponce, y éste lo que precisamente solicita en este caso es lo contrario: que se ordene el cumplimiento de lo pactado.

Por otro lado, tampoco opera la cláusula de resolución por incumplimiento a la luz del texto de los convenios y de la Ley de Municipios Autónomos, en particular su Art. 14.003 (21 L.P.R.A. sec. 4653) referente a las condiciones y requisitos para la delegación de competencias, porque el Estado no ha alegado que la delegación no ha agilizado el fin público que persigue; ni que el Municipio de Ponce ha ido contra normas o guías adoptadas por la agencia o departamento en cuestión; ni que el Municipio ha incumplido con cualquiera de las obligaciones contraídas.

■ Cuando el Estado decide unilateralmente no dar fiel cumplimiento a los convenios, ciertamente está usur-

pando una facultad que solamente corresponde a los tribunales. No podemos perder de perspectiva que

> ... la introducción del Injunction en nuestro ordenamiento jurídico abrió la posibilidad, por primera vez, de exigir el cumplimiento de ciertos contratos de manera forzosa.
> Fue, por tanto, con la introducción del Injunction que nuestros tribunales adquirieron el poder de compeler al cumplimiento específico de las obligaciones de la misma forma y manera que lo logran los tribunales de la equidad norteamericana. Rivé Rivera, *op. cit.*, pág. 47.[4]

■ *Probabilidad de que la causa se torne académica de no concederse el "injunction".* El criterio en torno a la academicidad de la causa está estrechamente relacionado con el de la irreparabilidad de los daños o la existencia de un remedio adecuado en ley. Existe la probabilidad de que de continuar el incumplimiento de las obligaciones contraídas en los convenios por el Estado, el Municipio de Ponce se vea obligado a eliminar la implantación de los convenios y esto tornaría académico cualquier remedio que se pueda conceder posteriormente.

*Posible impacto sobre el interés público.* El Estado no demostró un alto grado de interés público que impidiera la concesión del remedio que se concede. El Municipio de Ponce, por el contrario, lo hizo. La prueba desfilada en la vista ante el tribunal de instancia demuestra claramente el impacto adverso que el incumplimiento contractual del Estado ha tenido sobre el Municipio de Ponce, sus servicios, sus obras y el bienestar y la calidad de vida de sus residentes. Véase el esc. 3.

■ La concesión de un *injunction* preliminar descansa en el ejercicio de una sana discreción judicial que se ejercerá ponderando las necesidades y los intereses de to-

---

[4] Véanse, además: *Vázquez v. Tribl. Superior*, 78 D.P.R. 744 (1955); *Compañía Teatral v. Lloveras*, 40 D.P.R. 148 (1929); *Fajardo Sugar Co. v. Porrata Doria*, 37 D.P.R. 747 (1928); *Loíza Sugar Company v. Hernaiz y Albandoz*, 32 D.P.R. 903 (1924); *Núñez v. Soto Nussa, Juez de Distrito*, 14 D.P.R. 199 (1908).

das las partes involucradas en la controversia. Aunque el remedio concedido no constituye una adjudicación final en los méritos del caso, al día de hoy no se ha controvertido el hecho de que los convenios han sido suscritos por las autoridades competentes y que éstos se presumen válidos. Es imperativo que se cumpla con los convenios hasta que se dilucide la controversia sobre su validez.

■ Más aún, aunque bajo la Regla 57.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, no se le puede requerir a los municipios la prestación de fianza como condición para un *injunction* preliminar, según se señala en la resolución del tribunal de instancia, la prueba traída por el Municipio de Ponce demuestra que el Centro de Recaudación de Ingresos Municipales (C.R.I.M.) tiene un procedimiento mediante el cual se les deduce a los municipios cualquier deuda que éstos tengan con el Gobierno Central o con las corporaciones públicas.([5]) Esta sería una alternativa para que el Municipio de Ponce devuelva fondos al Estado si

---

([5]) El Centro de Recaudación de Ingresos Municipales (C.R.I.M.) fue creado mediante la Ley Núm. 80 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. sec. 5801 *et seq.*, como una entidad municipal independiente que tiene el objetivo primordial de recaudar, recibir y distribuir a los municipios los fondos obtenidos mediante los impuestos sobre la propiedad mueble e inmueble. Entre las amplias facultades y poderes del C.R.I.M. están:

"1) hacer cumplir la Ley de Contribución Municipal sobre la Propiedad Mueble e Inmueble;

"2) poner y mantener al día el catastro de propiedades inmuebles;

"3) recaudar la contribución sobre la propiedad según los tipos impuestos por los municipios y de acuerdo a los topes máximos [establecidos por ley];

"4) establecer un fideicomiso en el Banco Gubernamental de Fomento para los siguientes ingresos, los cuales constituirán el Fondo de Equiparación;

"a) la contribución sobre la propiedad mueble (1.00%) e inmueble (3.00%),

"b) la lotería adicional,

"c) el 2.02% de las rentas internas netas del Fondo General;

"5) cobrar cuentas transferidas por el Departamento de Hacienda;

"6) contratar con agencias públicas, instituciones financieras y cooperativas para que presten servicios de recaudación;

"7) agilizar la tasación de propiedades nuevas y las no tasadas anteriormente;

"8) distribución y proveer fondos a los municipios[;]

"9) tomar préstamos y emitir pagarés para hacer anticipos de contribuciones a los municipios;

"10) adoptar, derogar y enmendar reglamentos;

"11) embargar y ejecutar propiedades en pagos de deudas;

finalmente aquél no prevalece después del correspondiente juicio en su fondo.

El Estado no sometió sus alegaciones al balance de derechos y equidades implicados en el caso de autos, conforme las directrices jurisprudenciales antes elaboradas. Tampoco sometió prueba en la vista celebrada ante el tribunal de instancia en apoyo de su contención. Las alegaciones del Estado en cuanto a la nulidad de los convenios no constituyen prueba que pueda derrotar la prueba documental y testifical presentada por el Municipio de Ponce en la vista sobre el remedio provisional ante dicho tribunal. *Reece Corp. v. Ariela, Inc.*, 122 D.P.R. 270 (1988); *Asoc. Auténtica Empl. v. Municipio de Bayamón*, 111 D.P.R. 527, 531 (1981). La nulidad o validez de los convenios es asunto a determinarse en el juicio en su fondo y no mediante el presente recurso.

No obstante los anteriores pronunciamientos, *se modificará la orden para eliminar la disposición que decreta la transferencia de personal, remedio que no fue solicitado por el Municipio de Ponce. Así modificada, se confirmará.*

El Juez Asociado Señor Negrón García disintió con opinión escrita. El Juez Asociado Señor Rebollo López disintió "por entender que, *en esta etapa de los procedimientos*, resulta improcedente en derecho ordenarle a la parte demandada que le satisfaga al Municipio de Ponce, demandante, las sumas de dinero por éste reclamadas en la demanda; sobre todo, cuando se considera que tanto el foro de instancia como este Tribunal estiman que la defensa levantada por la parte demandada, sobre nulidad de los contratos

---

"12) ajustar el valor de la exoneración a propiedades ocupadas por sus dueños y las tasas contributivas con excepción de la tasa de 1.03 por ciento que corresponde al Fondo de Redención de Deuda;

"13) otras funciones administrativas." Rodríguez Castro, *Finanzas municipales y análisis presupuestario*, en L. Santana Rabell y M. Negrón Portillo (editores), *La reforma municipal en Puerto Rico: retos y oportunidades*, Escuela Graduada de Administración Pública, U.P.R., 1993. En esta útil obra se analizan diversos aspectos del proceso de reforma municipal iniciado en 1991, con particular énfasis en la Ley de Municipios Autónomos.

otorgados por las partes, es una que debe ser dilucidada en un juicio plenario. La acción hoy tomada por una mayoría de los integrantes del Tribunal es totalmente contraria a la normativa pertinente vigente en nuestra jurisdicción y la misma verdaderamente resulta ser inexplicable desde un punto de vista jurídico".

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

I

La recta solución de este recurso nos recuerda a Savigny: "A los juristas les es indispensable un doble sentido -escribía en el *Beruf* de 1814-: el histórico, para captar con agudeza lo peculiar de cada época y de cada forma jurídica, y el sistemático, para ver a cada concepto y a cada precepto en una conexión y una interacción vivas con el todo, es decir, en la única conexión que es verdadera y natural." F.K. Von Savigny, *De la vocación de nuestra época para la legislación y la ciencia del Derecho*, (J. Díaz García, Trad.), Madrid, Ed. Aguilar, 1970, pág. 83.

Es improcedente el *injunction* preliminar que ordena al Gobernador Hon. Pedro Rosselló González y demás funcionarios ejecutivos del Gobierno Central la inmediata transferencia de cuantiosas sumas de fondos públicos al Municipio de Ponce. Como cuestión de derecho debimos anularlo y desestimar sumariamente la demanda, pues no es probable que dicha municipalidad pueda prevalecer en los méritos.

De entrada, en buena técnica judicial dispositiva, expongamos sucinta, pero ordenadamente, las premisas jurí-

dicas y de hechos que sirven de andamiaje a la opinión mayoritaria. Lo hacemos, pues algunas están dispersas y otras entremezcladas o inmersas con expresiones genéricas de cuestionable validez. Ello nos permitirá demostrar cómo su estructura interna y algunos de sus argumentos se contradicen entre sí. La falla principal de carácter sustantivo es que omite reconocer lo impostergable, decisivo y crucial: *la nulidad radical de los convenios*. Nos explicamos.

De un lado se acepta que este caso "versa propiamente sobre la *nulidad o validez* de los cinco (5) convenios" ((énfasis en el original) opinión mayoritaria, pág. 783); que la "defensa afirmativa principal del Estado, desde su contestación a la demanda, ha sido que '[l]os convenios otorgados entre el Municipio de Ponce y las agencias demandadas son nulos' " (íd); que no se "han cerrado las puertas de los tribunales" para esa adjudicación (íd), y que la concesión o no del *injunction* preliminar conlleva, entre otros requisitos, examinar "la probabilidad de que [el Municipio] prevalezca eventualmente" (íd., pág. 785), para luego afirmar que la validez o nulidad de los convenios debe determinarse "en el juicio en su fondo" (íd., pág. 793).

*Esa posposición adjudicativa es más aparente que real.* Choca con las múltiples aseveraciones que *prejuzgan* los méritos del caso, tales como que el Municipio de Ponce ha pagado con sus fondos "salarios, beneficios marginales y otros, *de los empleados que fueron transferidos mediante convenio*" ((énfasis suplido) opinión mayoritaria, pág. 786); que los "convenios se *presumen* válidos" y el Estado *tiene que cumplirlos* "independientemente de los *cambios* en administraciones de gobierno ... del partido político en el poder" ((énfasis suplido) íd., pág. 788); que la cláusula de resolución unilateral en los convenios *no opera* pues la posee sólo el Municipio "de manera absoluta" (íd., pág. 790) y que "[c]uando el Estado decide unilateralmente no dar fiel cumplimiento a los convenios, ciertamente está

usurpando una facultad que solamente corresponde a los tribunales" (íd., págs. 790–791).

Finalmente, la mayoría ordena la transferencia de cientos de miles de dólares, pero revoca el traslado del "personal" adicional aduciendo que el Municipio de Ponce no lo solicitó.

## II

Por sus propios términos, de su faz son *nulos* los cinco (5) convenios suscritos *después* de las elecciones —y pocos días antes (25 y 30 de noviembre y 31 de diciembre de 1992) de cesar en sus cargos— por el entonces Gobernador Hon. Rafael Hernández Colón, los Secretarios y Directores del Departamento de Transportación y Obras Públicas, el Departamento de la Vivienda, el Departamento de Recursos Naturales, la Junta de Calidad Ambiental, la Junta de Planificación y la Administración de Reglamentos y Permisos (A.R.Pe.), con el Alcalde del Municipio de Ponce, Hon. Rafael Cordero Santiago.

Mediante tales convenios, *efectivos* el 1ro de enero de 1993, delegaron en dicha municipalidad la competencia y ejecución de las funciones que tradicionalmente, como gobierno central, les correspondían. Coetáneamente se obligaron a transferirle personal y fondos, ello al amparo de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. sec. 4001 *et seq.*

En dos (2) importantes vertientes los convenios atentan contra el interés público, la propia Ley Núm. 81, *supra*, y la Ley de Personal del Servicio Público de Puerto Rico, Ley Núm. 5 de 14 de octubre de 1975, según enmendada, 3 L.P.R.A. sec. 1301 *et seq.* Expongámoslas.

## III

*Primero*, según indicado, los convenios fueron suscritos por el Gobernador Honorable Hernández Colón, el Alcalde Honorable Cordero Santiago y otros funcionarios ejecutivos los días 25 y 30 de noviembre y 31 de diciembre de 1992, *próximo a expirar el mandato de ese cuatrienio*. Los traslados de personal y, por imperativo funcional, la transferencia de fondos para sufragar sus nóminas, *fueron pactados violándose crasa y directamente la prohibición contenida en la Ley de Personal del Servicio Público de Puerto Rico* que así lo prohíbe "dos meses antes y *dos meses después* de la celebración de las Elecciones Generales", salvo "necesidades *urgentes* del servicio, *previa* la aprobación del Director, conforme a las normas que se establezcan mediante reglamento". 3 L.P.R.A. sec. 1337. De paso, aclaramos que este impedimento se extiende a los municipios "hasta el segundo lunes del mes de enero siguiente". Íd. Paralelamente, la propia Ley Núm. 81, *supra*, que estableció este esquema de convenios de delegación, en su Art. 12.014 (21 L.P.R.A. sec. 4564) ratificó esa veda electoral bajo *sanción expresa de nulidad*.

Aparte de la circunstancia de que esos funcionarios cesaban en sus cargos pocos días después, ¿qué "necesidades urgentes del servicio" podrían justificar esos masivos traslados, vía excepción?

No cabe argumentar que debido a que los traslados del personal se hicieron en enero de 1993 —con posterioridad al comienzo de la nueva administración y con la aprobación *en ese momento* de la Oficina Central de Administración de Personal (en adelante O.C.A.P.)— son inaplicables las prohibiciones electorales. El impedimento legislativo en torno a cualquier transacción de personal estatal y municipal durante los períodos pre y post eleccionarios no puede soslayarse a base de que su implantación y ejecución serán efectivos *después* de expirada la prohibición. Si el convenio

dispositivo de la transacción de personal se suscribe *durante* el susodicho período, *la nulidad es absoluta. Ortiz v. Alcalde de Aguadilla*, 107 D.P.R. 819, 824–825 (1978). "Por ser el período comprendido en la veda uno donde llegan a su máxima efervescencia las pasiones políticas, y donde pueden las flaquezas humanas traducidas en bondad para los partidarios o represalia contra el adversario —*Ortiz v. Alcalde*, supra— prevalecer sobre las necesidades reales del pueblo en el campo de la salud, se impone la prohibición como detente legislativo en pro del bienestar común." (Escolio omitido.) *Hosp. San Pablo v. Hosp. Hnos. Meléndez*, 123 D.P.R. 720, 729–730 (1989). Otra interpretación derrotaría la letra, el propósito y el espíritu que animó a la Asamblea Legislativa a aislar el sistema de mérito de personal de las prácticas partidistas tradicionales de patronazgo, despojo, acomodo y oportunismo.

Nótese que el permiso del Director de la O.C.A.P. tiene que ser *antes* ("previo"), no *después*, condición que no se dio en *ninguno* de los contratos. Aparte de esa violación a la Ley de Personal del Servicio Público de Puerto Rico, al suscribir dichos convenios el Gobernador Honorable Hernández Colón, el Alcalde Honorable Cordero Santiago y otros jerarcas máximos ejecutivos, para todos los efectos, dieron por sentado que el Director de O.C.A.P. autorizaría esos traslados rutinariamente y así le trazaron e impusieron un único curso de acción, sin siquiera cumplir las normas mínimas reglamentarias vigentes de excepcional urgencia.

*En el fondo estamos ante una vulneración de norma legislativa de sana moralidad y administración pública que intenta evitar que aquellos funcionarios en el umbral de su gestión gubernamental puedan extender, ejercer y perpetuar su poder e influencia más allá del cuatrienio en el cual les correspondía servir.*

En resumen, los convenios para trasladar el personal de estas agencias son ilegales y nulos *ab initio*. Su efectividad e implantación no podía postergarse para después de cesar

en sus cargos por imperativo constitucional, el Gobernador Honorable Hernández Colón y los demás funcionarios ejecutivos salientes.

Para superar esta realidad, la mayoría del Tribunal ordena sólo la transferencia de fondos, no del personal. *Es imposible fraccionar el remedio, pues personal y fondos están inextricablemente atados.* Si el traslado del personal acordado durante el período de veda electoral está viciado de nulidad, ¿cómo pueden ordenar el pago precisamente de los "gastos en concepto de salarios, beneficios marginales y otros, de los empleados que fueron transferidos *mediante convenio*"? (Énfasis suplido.) Opinión mayoritaria, pág. 786.

## IV

*Segundo,* el Gobernador Honorable Hernández Colón y demás funcionarios le concedieron *ilegalmente* al Municipio de Ponce la facultad *absoluta de terminarlos unilateralmente*, independientemente de que éste hubiese o no cumplido sus cláusulas. Curiosamente pactaron —salvo la Junta de Planificación y A.R.Pe.— que esa "terminación unilateral ... no se considerar[ía como] incumplimiento o violación del Convenio". Petición de *certiorari*, Anejo III, Anejo A, pág. 96. *Paradójicamente le negaron ese mismo derecho al Gobierno Central.*

En otras palabras, le dieron la abrumadora *ventaja* al Municipio de Ponce de dejar sin efecto los convenios cuando lo estimara conveniente, sin consecuencia legal alguna y, *simultáneamente*, obligaron y sometieron al Gobierno Central al *perjuicio* de mantenerse atado sin poder invocar igual prerrogativa. La Ley Núm. 81, *supra*, no permite ese tipo de resolución *unilateral*; por el contrario, su Art. 14.008 (21 L.P.R.A. sec. 4658) visualiza unas negociaciones balanceadas entre los funcionarios ejecutivos del Gobierno Central y las municipalidades.

La situación es más grave en cuanto al convenio trans-

firiendo las funciones de la Junta de Planificación y A.R.Pᴇ. "a perpetuidad". Ello, claramente, es contrario al interés público; en específico, el mandato del Art. 14.005(g), 21 L.P.R.A. sec. 4655(g), que preceptúa fijar "el término de tiempo durante el cual el municipio ejercerá la competencia o la vigencia del convenio ...".

Es inconcebible que pueda argüirse la legitimidad de ese acto que intenta privar para *siempre* a la Asamblea Legislativa y al Primer Ejecutivo de la facultad de regular los importantes procesos de planificación en el Municipio de Ponce, imponiéndoles el riguroso deber de demostrar —para su revocación— que "el Municipio ha incurrido en negligencia crasa, fraude o conducta criminal".

*Estamos ante unos convenios nulos e ilegales que favorecen y aprovechan en extremo al Municipio de Ponce y evidentemente atentan contra el interés público y la ciudadanía en general.* La única forma de salvar esta anomalía es reconocerle al Gobierno Central igual facultad; *lo demás es simplemente un absurdo jurídico.* ¿Cómo la mayoría del Tribunal puede avalar que el Municipio de Ponce tenga más poderes y facultades contractuales que el Gobierno Central?

Como precedentes, los casos *Flores v. Municipio de Caguas*, 114 D.P.R. 521 (1983), y *Camacho Arroyo v. E.L.A.*, 131 D.P.R. 718 (1992), invocados por la mayoría, más bien *abonan a nuestro disentir.* Al respecto, en *Flores v. Municipio de Caguas*, supra, pág. 530, reconocimos que la facultad del gobierno de terminar unilateralmente un contrato "se estima presente, *aunque no se haya estipulado expresamente* en los contratos". (Énfasis suplido.) Más aún, como resolvimos en *Camacho Arroyo v. E.L.A.*, supra, pág. 732, una cláusula bilateral de este tipo la consideraremos no "nociv[a] al orden público y que, por el contrario, a la luz del Art. 1207 del Código Civil, *supra, lo que en efecto sería detrimental al interés público es negarle* al Estado la flexi-

bilidad que le garantiza esta cláusula resolutoria expresa". (Énfasis suplido.)

La no inclusión en estos convenios de la cláusula de terminación unilateral en favor del Gobierno Central favoreció al Municipio de Ponce, al decir mayoritario, "de manera absoluta". Refleja que sus suscribientes, Honorables Hernández Colón, Cordero Santiago y funcionarios concernidos, optaron por omitirla, siendo *claro que no estaban en libertad de hacerlo por oponerse a la ley y al orden público.* Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372.

Aun así, esa ventaja contractual municipal no varía la verdadera ruta adjudicativa. Nuestra jurisprudencia estima que dicha cláusula está "presente", esto es, *escrita e inserta en todos los convenios. En consecuencia, la negativa del Gobierno Central a desembolsar los fondos públicos es una actuación compatible con el derecho y la determinación que ha adoptado de darlos por finalizados; así debimos decidirlo.*

## V

*Recapitulando*, de su faz los convenios de delegación de competencias y funciones suscritos por el Alcalde del Municipio de Ponce Honorable Cordero Santiago con el entonces Gobernador Honorable Hernández Colón y demás funcionarios ejecutivos —pocos días antes de cesar en sus cargos— son *nulos* pues fueron firmados *durante un período de veda post electoral.* No podían comprometer ni imponerle semejantes obligaciones a la nueva administración entrante.

Además de este fundamento, la nulidad de los convenios es *radical* porque la cláusula de resolución que le concedió al Municipio de Ponce como ventaja "absoluta", esa facultad unilateralmente atenta contra el interés público. De ser válida, según nuestra doctrina jurisprudencial, debe

entenderse que el Gobierno Central goza de *igual* prerrogativa y su decisión de darlos por terminados es eficaz en derecho.

"Resolver en otra forma sería propiciar el craso incumplimiento por los funcionarios públicos de las leyes y reglamentos que rigen sus actuaciones." *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 693 (1987). Fueron ilegales y no procedía el traslado del personal; menos la transferencia de fondos.