Escribano Medina, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Comparecen ante nos los recurrentes Caguas Real S. EN C. por A.S.E., et al, solicitando la revisión de una resolución del Departamento de Asuntos del Consumidor (DACO) dictada el 22 de septiembre de 2003, notificada en la misma fecha, en la que se declaró No Ha Lugar a una moción de reconsideración de una resolución distada por DACO el 24 de junio de 2003.
I
Para los meses de mayo a agosto de 1998, los recurridos gestionaron contratos de opción a compra de unas residencias programadas a construirse en el Municipio de Caguas. Para esto, los recurridos entregaron la cantidad de $10,000.00 para separar la propiedad interesada.
Posteriormente, los recurridos recibieron una carta por parte del desarrollador donde se les informó de un aumento en el precio de la propiedad separada y la reubicación de los solares separados. Según admiten los recurridos en su escrito de oposición, éstos aceptaron la reubicación de los solares, mas no así el alza en el precio de la propiedad. En vista de lo anterior, los recurridos presentaron en DACO querellas individuales alegando incumplimiento de contrato por parte de los recurrentes.
Llevadas a cabo las vistas en su fondo ante DACO, el 24 de junio de 2003 se dictó resolución en la que se *1163 ordenó a los recurrentes a cumplir el contrato de opción a compra y a citar a los recurridos para la firma del contrato de compraventa de las unidades opcionadas, pero honrando el precio original.
Oportunamente, los recurrentes presentaron moción de reconsideración alegando no poder cumplir con la resolución de DACO por estar en una situación económica precaria.
Declarada Sin Lugar la moción reconsideración, los recurrentes acuden ante nos en recurso de revisión señalando los siguientes errores:

“PRIMER SEÑALAMIENTO DE ERROR:

Erró DACO al obligar a Caguas Real a suscribir un contrato de compraventa con los querellantes y, por consiguiente, realizar la venta de ciertos inmuebles que no van a ser construidos.

SEGUNDO SEÑALAMIENTO DE ERROR:

Erró DACO al determinar que ‘proyecto se construyó’ y al así hacerlo no aplicar las reservas contractuales contenidas en la advertencia la cual forma parte de los términos contractuales suscritos entra las partes.

TERCER SEÑALAMIENTO DE ERROR:

Erró DACO al disponer que existe un f mandamiento aprobado para la construcción de las residencias en controversias para de esta manera no considerar la aplicabilidad de las reservas contractuales contenidas en el contrato de opción a compra entra las partes. ”

Perfeccionado el recurso con la comparecencia de los recurridos en escrito de oposición, resolvemos que no le asiste la razón a los recurrentes. Veamos.
II
Por estar los señalamientos de error estrechamente relacionados, serán resueltos conjuntamente.
En virtud de la Ley Núm. 130, de 13 de junio de 1967, 17 L.P.R.A. sec. 501 y siguientes, DACO promulgó el Reglamento 2268, 10 R.P.R. sec. 250.1901, para regular las distintas actividades en el negocio de la construcción de viviendas privadas en Puerto Rico. El Secretario de DACO quedó facultado para investigar y adjudicar querellas sobre prácticas indeseables en el negocio de la construcción y conceder los remedios pertinentes, conforme a derecho. Quiñones Irizarry v. San Rafael Estates, S.E., 143 D.P.R. 756 (1997).
El Artículo 9 de la Ley 130, supra, 17 L.P.R.A. Sec. 509(b), define como practicas indeseables:

“Incurrirá en práctica indeseable en el negocio de la construcción de vivienda todo urbanizador o constructor que:

(a)...

(b) ...

(c) Altere o modifique los planos de una vivienda o modelo aprobado por la Junta de Planificación y/o la Administración de Reglamentos y Permisos, disponiéndose que toda solicitud de enmienda a los planos o especificaciones del proyecto radicada ante la Junta de Planificación y/o la Administración de Reglamentos y Permisos deberá estar precedida de un aviso cursado por el urbanizador o constructor a los optantes y/o 
*1164
compradores, mediante correo certificado con acuse de recibo con por lo menos veinte (20) días de antelación a la radicación de las enmiendas allí solicitadas. ”

Así también, el Artículo 10 del mismo cuerpo de Ley establece, en lo pertinente, que:

“(a)...

(b) El contrato de opción contendrá sin perjuicio de otros los siguientes particulares:

(1) -

(2) ...

(3)...

(4)...

(5) ...

(6)...

(7)...

(8) derecho del comprado a exigir el cumplimiento específico de su contrato de opción, o a resolverlo por no haber el vendedor cumplido con sus obligaciones bajo el mismo, en cuyo caso tendrá derecho a que se la devuelvan íntegramente sus anticipos.

(c) El contrato de promesa de compraventa o el de compraventa contendrá con precisión razonable los particulares enumerados en las cláusulas (1) al (6) del inciso (b) que precede, y además dispondrá:

(1) Precio cierto, que no se podrá aumentar a menos que sea por acuerdo de las partes. ”

De otro modo, el Reglamento 2268, sección 10, también define lo que es práctica indeseable, en lo pertinente a este caso, como:

“Incurrirá en práctica indeseable en el negocio de la vivienda todo urbanizador y/o constructor que:

a) [...]

Un urbanizador y/o constructor tendrá la obligación de notificar por correo certificado con acuse de recibo sobre toda solicitud de cambio de plano o especificaciones que se vaya a someter a la Junta de Planificación y/o ARPE, como sigue:

a) A todos los residentes y compradores de un proyecto los ‘items ’ 1, 2, 3, 9, y 10.

b) A todos los compradores solamente los ‘items’ 4, 5, 6, 7, y 8.

1. Cambios en la zonificación.

2. Cambio en la facilidades vecinales, institucionales o usos accesorios previamente comprometidos con el 
*1165
comprador.

3. Cambios en las calles y accesos.

4. ...

5....

6....

7. Cambio de modelo.

8....

9. Cambio en uso de terrenos previamente aprobados para facilidades comerciales, recreativas y otros usos.

10. Cambios de cualquier naturaleza que afecten las unidades de vivienda.

b)...

c) Altere o modifique los planos, especificaciones o permisos de la construcción de una vivienda o modelo aprobado por la Junta de Planificación y/o ARPE.” (Subrayado nuestro)
La sección 11 establece los requisitos que contendrán los contratos de opción. En su inciso 7 se dispone que en el contrato tiene que estar incluido el precio de venta tentativo, el cual podrá variarse por cambios en los planos autorizados por las agencias con jurisdicción, y el pronto aproximado.
De esto ocurrir, el urbanizador y/o constructor notificará al comprador el referido aumento y éste podrá aceptarlo o resolver el contrato, en cuyo caso, el urbanizador y/o constructor devolverá al comprador su depósito.
Con relación a la doctrina de los contratos, en Puerto Rico rige el Principio de Libertad de Contratación, con arreglo al cual los contratantes pueden acordar lo que quieran, siendo la voluntad de las partes la ley suprema entre ellos, acuerdos que nunca podrán ser contrarios a las leyes, la moral o el orden público. Municipio de Ponce v. Rosselló, 136 D.P.R. 776 (1994).
Cuando los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, debe prevalecer el sentido literal de las cláusulas en él provistas. Marcial Burgos v. Tomé, 144 D.P.R. 522 (1997).
Tal circunstancia nos obliga a regirnos por lo dispuesto en los artículos 1233 y 1234 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3471 y 3472; este Tribunal debe observar la intención de las partes ateniéndose, en primer lugar, al sentido literal de las cláusulas a que se obligaron mediante el contrato de opción, Unisys v. Ramallo, 128 D.P.R. 842 (1991), lo que no requiere de esfuerzo mayor.
Las cláusulas de un contrato deben interpretarse de manera integral, no aisladamente, buscando su verdadero sentido, atendiendo cada cláusula con relación a las otras. CNA Casualty de P.R. v. Torres Díaz, 141 D.P.R. 27 (1996). Conforme a lo cual, el aumento en precio debió notificarse dentro del año provisto para suscribir el contrato de compraventa.
Surge del contrato de opción que el precio de las residencias era uno de carácter tentativo y que en caso de *1166 haber alguna variación en el área o medidas del solar de acuerdo con la aprobación final del plano por ARPE o la Junta de Planificación, el exceso o merma de cabida se ajustaría a razón de $60.00 por cada metro cuadrado.
Surge además que dentro del año a partir de la firma del contrato de opción, el vendedor citaría al comprador para que dentro de los siguientes treinta (30) días a partir de la notificación, se firmara el contrato de compraventa.
La realidad fáctica que surge de los documentos ante nos es que hubo un cambio en la zonificación y las medidas de los solares de los recurridos. No obstante, la recurrente no honró el contrato haciendo los ajustes a razón de $60.00 el metro cuadrado, sino que aumentó el valor de las propiedades en un mínimo de $78,000.00.
Por otro lado, la firma de los contratos de opción se registra para los meses de mayo a junio de 1998 y no fue hasta el 1 de agosto de 2001 (esto es, tres años después) que le notificó el aumento en el valor de la propiedad violando de esta manera las disposiciones concernientes a la firma del contrato de compraventa dentro de los treinta (30) días siguientes a la firma del contrato de opción.
No conforme con lo anterior, la referida carta del 1 de agosto de 2001 tampoco mencionaba fecha, lugar y hora a donde asistir los recurridos para la firma del contrato de compraventa.
Además, el documento titulado “Advertencia”, el cual se le otorgó a los recurridos semanas antes de la firma del contrato de opción, disponía lo siguiente:

“El proyecto Caguas Real tiene un permiso de construcción condicionado por parte de la Administración de Reglamentos y Permisos, lo que significa que aún está pendiente el endoso de algunas agencias estatales y/o federales. Además, esta pre-venta es -entre otras cosas- para determinar la viabilidad económica del proyecto y su aceptación.

En consecuencia, el plano de lotificación puede sufrir enmiendas incluyendo la eliminación de varios solares y cambios de alineación de algunas calles.

Caguas Real, S. en C. Por A.S.E. se compromete a devolver a la persona nombrada en el recibo que se aneja, la totalidad del depósito en éste especificado, si el bloque y/o solar es eliminado del plano de lotificación, según finalmente aprobado o, a discreción de la empresa, relocalizarlo en otro bloque y solar que sea de la aprobación de la persona nombrada en el recibo. De igual manera se compromete a honrar el precio establecido en el recibo, si el proyecto se construye, o devolver dicho depósito sin penalidad adicional, si por alguna razón no se constmye. ”

Como podemos apreciar del documento antes citado, nada surge sobre una cambio en el precio de las residencias. El mismo se limita a establecer que debido a la permisología, puede haber enmiendas en el plano de lotificación, lo que conllevaría cambios en el alineamiento de calles o incluso eliminación de solares.
Más aún, los recurrentes se comprometieron a honrar el precio establecido, si el proyecto se constmye. Semanas después de firmar esta “Advertencia”, los recurridos firmaron los contratos de opción con los precios de los solares debidamente establecidos, estableciendo que de haber algún cambio en la cabida del solar, el precio sería ajustado, como mencionamos anteriormente.
Todos los documentos demuestran que el proyecto, a pesar de haber sufrido cambios físicos o estructurales, se construyó y los recurrentes estuvieron dispuestos a concederle a los recurridos un nuevo solar en el proyecto, por lo que entendemos que se tiene que honrar el precio contado en el contrato de opción. Todo lo antes mencionado sólo demuestra un craso incumplimiento de contrato por parte de los recurrentes.
*1167 Como segundo punto debemos señalar que los recurrentes violaron las disposiciones de ley referentes al negocio de la construcción antes mencionadas.
Como observamos, el Reglamento 2268, supra, establece que el Urbanizador y/o constructor (en este caso los recurrentes), tenían que notificar por correo certificado con acuse de recibo a todos los compradores sobre toda solicitud de cambio de planos o especificaciones que se vaya a someter a la Junta de Planificación y/o a ARPE.
En el caso de marras, surge que el 24 de mayo de 1999 (aproximadamente un año después de firmado los contratos de opción), la recurrente Caguas Real publicó una circular en el periódico El Nuevo Día donde notificaba el éxito que había tenido el proyecto y el logro de haber obtenido unos permisos por las agencias correspondientes.
Para octubre de 1999, surge el hallazgo de piedra viva. Del 20 de diciembre de 2000 y 19 de septiembre de 2001, fueron aprobados las enmiendas al proyecto por ARPE y es el 16 de mayo de 2001 que mediante circular firmada por el Ledo. Pedro Ortiz Alvarez, se le hace saber al Ledo. Femando L. Torres Ramírez, Secretario del DACO, sobre el alza en precio de las residencias. Es entonces que el día 1ro. de agosto de 2001 se le notificó a los recurridos sobre el alza en precio de sus residencias.
Esto es totalmente contrario a lo dispuesto en la ley, la cual establece que primero se tiene que notificar a los compradores antes de presentar los cambios en ARPE y/o la Junta de Planificación, para que éstos tengan la oportunidad de acudir a DACO y presentar las objeciones que tuviesen a bien.
El permitir este tipo de conducta no sólo viola la ley y reglamento antes citados, sino que menoscaba el debido proceso de ley de los recurridos conferido por la Constitución de Puerto Rico en su Artículo 7, sección II.
Finalmente, en cuanto al financiamiento del proyecto, surge del expediente un artículo de prensa el cual dispone claramente que el Banco Santander había aprobado 66 millones para financiar el proyecto. 
Como punto final, debemos reiterar que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto. Rubín Ramírez v. Trías Monge, 111 D.P.R. 481 (1981). Su revisión judicial se limita a determinar si la agencia actuó arbitraria o ilegalmente, o en forma tan irrazonable que su actuación constituyó un abuso de su discreción. Fuentes v. A.R.P.E., 134 D.P.R. 947 (1993); Del Rey v. J.A.C.L., 107 D.P.R. 348, 355 (1978); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692 (1975).
De aquí que los foros administrativos sean los encargados, en primera instancia, de la interpretación de los términos de las leyes que, por encomienda legislativa, tienen que ejecutar y hacer valer. La Facultad para las Ciencias Sociales Aplicadas, Inc. v. Consejo de Educación Superior, 133 D.P.R. 521 (1993). Así, cuando existiera más de una interpretación razonable de los hechos ante su consideración, los tribunales vienen obligados a sostener la decisión de la agencia y no pueden sustituir su criterio por el de ésta. Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953). Al revisar las determinaciones de hechos, la evidencia debe ser considerada en su totalidad. Hilton Hotels v. Junta de Salario Mínimo, supra.
La evidencia sustancial para sostener la actuación administrativa es aquélla que una mente razonable puede aceptar como adecuada para sostener una conclusión. Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670 (1953). Corresponde a los foros administrativos interpretar los estatutos y/o reglamentos que administran, por cuanto se les reconoce vasta experiencia y conocimiento especializado en relación a la materia con la cual trabajan día a día. Ríos Colón v. F.S.E., 139 D.P.R. 167 (1995), 95 J.T.S. 133, op. de 11 de octubre de 1995. La *1168 intervención de nuestro foro está limitada a evaluar si la decisión de la agencia es razonable, y no si hizo una determinación correcta de los hechos ante su consideración. Hilton Hotels v. Junta de Salario Mínimo, supra.
Ill
En mérito de lo antes expresado, se confirma la resolución recurrida.
Lo acordó el Tribunal y lo certifica la señora Secretaria General.
Aida I. Oquendo Graulau
Secretaria General
ESCOLIO 2004 DTA 69
1. El recorte de prensa reza: “The first Stage of the multi-million dollar, mixed-use project is scheduled to begin construction by mid-May with a $66 million investment (excluding the cost of the hotel) and will included 100-plus luxury homes, a golf course, a club house, and the Hampton Inn & Suites Hotel.
“Santander Bank has approved the $66 million financing for the project, ” Ventura said.