# 2006 DTA 48

## TRIBUNAL DE CIRCUITO DE APELACIONES
## REGIÓN JUDICIAL DE BAYAMÓN

FE-RI CONSTRUCTION, INC.
Apelante

v.

HERNAN COPETE ORTIZ, HILDA MARIA JARAMILLO Y LA SOCIEDAD
LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Apelados

Núm. KLAN-06-00049

San Juan, Puerto Rico, a 17 de febrero de 2006

Panel integrado por su Presidente, el Juez Arbona Lago,
el Juez Miranda De Hostos y la Juez Pabón Charneco

Pabón Charneco, Jueza Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

Comparece ante nos Fe-Ri Construction, Inc., mediante recurso de apelación, solicitando la revisión de una Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón en San Juan. Mediante dicho

dictamen, el tribunal *a quo* declaró Con Lugar una *"Moción de Desestimación"* interpuesta por la parte apelada.

Por las razones que se expresan a continuación, se confirma en parte y revoca en otros aspectos la Sentencia apelada.

# I

Conforme surge del recurso ante nuestra consideración, el 13 de junio de 2005, Fe-Ri Construction, Inc., en adelante Fe-Ri, interpuso demanda contra Hernán Copete Ortiz, Hilda María Jaramillo y la Sociedad de Bienes Gananciales compuesta por ambos. El caso está predicado en varias causas de acción, a saber, incumplimiento de contrato, violación de deber fiduciario, competencia desleal, fraude, interferencia torticera de relaciones contractuales, enriquecimiento injusto, culpa *in contrahendo* y daños y perjuicios.

Se desprende de la demanda incoada que Fe-Ri es una corporación organizada en 1973 bajo las leyes del Estado Libre Asociado, que se dedica a la remodelación de interior de espacios comerciales tales como: oficinas, bancos, hoteles y tiendas; y construcción y confección de trabajos en madera, gabinetes y muebles hechos a la medida. Actualmente, las facilidades de Fe-Ri se encuentran ubicadas en el Municipio de Guaynabo y su presidente es Ariel Ferdman, en adelante, Ferdman.

Por su parte, el demandado Hernán Copete Ortiz, en adelante Copete, es de nacionalidad colombiana. Se planteó que para finales del año 2000 conoció a Ferdman y le hizo acercamientos para trabajar en Fe-Ri. Alegadamente, Copete representó tener destrezas especiales y pericia para ejercer funciones en áreas relacionadas con las operaciones de Fe-Ri.

Ante lo anterior, se alegó que el 4 de diciembre de 2000, Fe-Ri le hizo una oferta a Copete para trabajar como Gerente de Proyectos con un salario inicial de $60,000, más beneficios marginales. Planteó Fe-Ri que desde ese momento se le informó a Copete que sus deberes serían aquellos propios de la posición que se le había nombrado y las que, de tiempo en tiempo, se le asignaran. A su vez, Fe-Ri respaldó a Copete en sus gestiones para propósitos de inmigración y comenzó a realizar diligencias gestiones para que el Servicio de Inmigración y Naturalización (INS por sus siglas en inglés) le concediera a éste permiso de residencia temporera en Puerto Rico. Se alegó que, como parte de estas gestiones, Fe-Ri sufragó gastos por concepto de estadía, adelantos de cuotas y la preparación de documentos en apoyo de la petición para que Copete obtuviera su visado. A su vez, planteó que puso su plusvalía de varias décadas de negocio como instrumento para representar a las autoridades de INS la capacidad de contratar a Copete y el cumplimiento de los requisitos para obtener el visado.

A raíz de esas gestiones, Copete obtuvo permiso de INS para trabajar temporeramente para Fe-Ri en Puerto Rico mediante una visa de destrezas especiales. Copete comenzó a trabajar para Fe-Ri alrededor de junio de 2001. Entre las tareas que debía desempeñar se encontraban: planear, dirigir y coordinar proyectos, conseguir nuevos clientes, manejar procesos de subastas, revisar propuestas y planes de proyectos, entre otros. Sin embargo, Fe-Ri alegó en la demanda que durante el período de tiempo que duró la relación laboral, Copete nunca alcanzó a cumplir cabalmente con las expectativas que tenía la empresa. Inicialmente, Fe-Ri trató de dar la oportunidad de acomodar las necesidades de la empresa al desempeño de Copete, tomando en consideración el esfuerzo, tiempo y dinero invertido para traerlo desde Colombia y esperando que eventualmente éste alcanzara a cumplir con las metas esperadas. Además, alegó que despedir a Copete de su empleo acarreaba la consecuencia de que resultara inelegible para mantener su status de inmigración, por lo que sería deportado a su país.

Así las cosas, se alegó que Copete continuó trabajando para Fe-Ri, donde se le asignó estar a cargo de Feriwood, una división dedicada a la confección y construcción de gabinetes y muebles hechos a la medida. De los hechos alegados en la demanda se desprende que se le asignó a Copete la tarea de desarrollar una cartera de

subcontratistas como parte de una estrategia para aumentar las ventas de producción, la cual, según Fe-Ri, nunca desarrolló como se esperaba. Subsecuentemente, Copete continuó en conversaciones con la empresa para que lo respaldara en la tramitación de una solicitud de visa permanente. A mediados del 2002, Fe-Ri comenzó a efectuar los trámites conducentes a la obtención de la misma y a finales de 2004, el proceso estaba bastante adelantado y faltaba, entre otras cosas, que Fe-Ri sometiera ante INS los estados financieros corporativos como patrono peticionario.

No obstante, según alegado en la demanda, el desempeño de Copete continuaba siendo deficiente. Por tal razón, Ferdman se reunió con Copete para indicarle que la compañía no estaba segura de su compromiso con la empresa y que estaba renuente a continuar auspiciándolo y someter los estados financieros ante INS, sin que hubiera un compromiso de su parte. Así las cosas, Copete se comprometió a mejorar su desempeño en la empresa y ambas partes suscribieron el 19 de diciembre de 2004 un *"Contrato No Competitivo entre Hernán Copete y Fe-Ri Construction"*, en adelante, Acuerdo de No Competencia.

En dicho acuerdo, Copete se comprometía a no competir directa o indirectamente con las operaciones de Fe-Ri, sus sucesores, subsidiarias y cesionarios **durante el período de empleo y por un período después de la terminación del empleo**. También se acordó que Copete no debía hacer negocio con suplidores, ni clientes de Fe-Ri, ni podía ser propietario o administrar, operar, consultar o ser empleado en una empresa similar o que compitiera con la línea de comercialización de Fe-Ri.

No obstante, en el referido Contrato, las partes acordaron que Copete sí podía realizar actividades de diseño ejerciendo su profesión de arquitecto y cobrarlas aparte, siempre que tales actividades no constituyeran competencia para la empresa, se trabajaran fuera de horas laborables y no afectaran su labor. En el contrato se reconoció el acceso de Copete a los secretos comerciales, clientes y datos de la empresa, y éste se comprometía a no usar dicha información en su nombre o revelarla a terceros. Se acordó que el área geográfica a la cual se extendería el contrato era un radio de ciento veinte (120) millas respecto de la ubicación actual de la compañía.

Conforme se alegó, luego de suscrito el contrato y a tenor con los compromisos hechos por Copete, Fe-Ri sometió ante el INS sus estados financieros para que Copete obtuviera la residencia permanente. Sin embargo, una vez obtenida la misma, Fe-Ri alegó que las ejecutorias de Copete empeoraron, creando mayores retrasos en los proyectos que tenía a su cargo por el abandono funcional de sus tareas y su actitud de dejadez. Ante esa situación, se planteó que el 20 de mayo de 2005, Ferdman decidió hablar con Copete, quien rehusó reunirse con éste alegando estar enfermo. Ante la insistencia de Ferdman, Copete accedió acudir a la oficina al día siguiente, donde presentó su renuncia.

Fe-Ri alegó que Copete, mientras trabajaba para él, operaba un negocio y realizaba tareas y proyectos para su beneficio personal, en horas laborables, por las cuales cobraba, utilizando la plusvalía, clientes regulares y recursos de Fe-Ri. Planteó que Copete extrajo información confidencial, documentos y propiedad de la empresa para utilizarla en su beneficio. Alegó que Copete indujo a por lo menos un contratista afiliado de Fe-Ri a que abandonara su acuerdo de no competir con los clientes de la empresa. Copete, según se desprende de las alegaciones, ocultó estos actos a sabiendas de que estaba violando sus deberes contractuales y fiduciarios.

En consecuencia, Fe-Ri solicitó que el foro de instancia emitiera un interdicto provisional y un *injunction* preliminar ■ y permanente para que Copete: 1) devolviera la información, documentos y propiedad que retuvo y se abstuviera de utilizarla para competir deslealmente, y 2) cesara y desistiera de dedicarse a la remodelación de interiores de espacios comerciales y la confección de trabajos en madera, gabinetes y muebles hechos a la medida y/o dedicarse a negocios que compitieran con las operaciones de Fe-Ri.

El 13 de julio de 2005, Copete instó una *"Solicitud de Desestimación"*. Alegó que la demanda dejaba de exponer una reclamación que justificara la concesión de un remedio. Conjunto con dicho escrito, acompañó

copia del contrato suscrito entre las partes y alegó la nulidad del mismo, puesto que incumplía con los requisitos esenciales para la validez de un Acuerdo de No Competencia esbozados en *Arthur Young v. Vega III*, 136 D.P.R. 157 (1994).

El 22 de septiembre de 2005, el Tribunal de Primera Instancia celebró una Conferencia con Antelación a la Vista de *Injunction* y ordenó a Fe-Ri oponerse a la moción de desestimación instada. Oportunamente, Fe-Ri presentó una oposición, y posteriormente Copete interpuso una réplica.

El 29 de noviembre de 2005, notificada el 14 de diciembre de 2005, el tribunal *a quo* emitió Sentencia desestimando la demanda en su totalidad bajo el fundamento de que las cláusulas del Acuerdo de No Competencia, en el cual se basaban el resto de las alegaciones de la demanda, incumplían con lo resuelto en *Arthur Young Co. v. Vega III*, *supra*.

Inconforme con dicho dictamen, Fe-Ri recurre ante nos. Contando con el beneficio del alegato de Copete, procedemos a resolver.

## II

En su escrito, Fe-Ri plantea que incidió el Tribunal de Primera Instancia al desestimar las causas de acción: por incumplimiento de contrato; por violación de deber fiduciario; competencia desleal, fraude, interferencia torticera de relaciones contractuales; por enriquecimiento injusto; y por culpa *in contrayendo*; daños y perjuicios; no considerar la solicitud de *injunction* preliminar; y al conceder el pago de costas a favor de Copete.

## III

En su primer señalamiento de error, Fe-Ri alega que incidió el Tribunal de Primera Instancia al desestimar la causa de acción por incumplimiento de contrato. Plantea que de las alegaciones de la demanda no se desprende que el Acuerdo de No Competencia incumpliera con requisito legal alguno. Argumenta que el tribunal *a quo* al adjudicar la *"Solicitud de Desestimación"* tomó en consideración hechos ajenos a las alegaciones de la demanda, y se fundamentó en jurisprudencia que es distinguible del caso de epígrafe.

La Regla 10.2 (5) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 10.2, contempla como una de las defensas a presentar en una alegación respondiente o mediante moción antes de alegar, *"el dejar de exponer una reclamación que justifique la concesión de un remedio."* A los fines de disponer una solicitud de desestimación, el tribunal está obligado a dar por ciertas y buenas todas las alegaciones fácticas en la demanda radicada. El promovente de la moción tiene que demostrar que presumiendo que lo allí expuesto es cierto, aún así la demanda no expone una reclamación que justifique la concesión de un remedio. *Sucn. Rafael Concepción v. Bco. de Ojos,* 153 D.P.R. 488 (2001).

El Tribunal Supremo ha expresado que ante la presentación de una moción de desestimación, el foro de instancia tiene que tomar como ciertas todas las alegaciones bien hechas en la demanda. *Dorante v. Wrangler de Puerto Rico*, 145 D.P.R. 408 (1998); *Rivera Flores v. Cía. ABC*, 138 D.P.R. 1 (1995); *Ramos v. Orientalist Rattan Furnt., Inc.*, 130 D.P.R. 712 (1992); *González Camacho v. Santos Cruz*, 124 D.P.R. 396 (1989).

De otra parte, hay que considerar que la demanda sólo tiene que contener *"una relación sucinta y sencilla de la reclamación demostrativa de que el peticionario tiene derecho a un remedio".* Regla 6.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 6.1. Las alegaciones sólo tienen el propósito de notificar, a grandes rasgos, a la parte demandada, de las reclamaciones en su contra, para que pueda comparecer a defenderse si así lo desea. *Reyes v. Cantera Ramos, Inc.*, 139 D.P.R. 925 (1996); *Rivera Flores v. Cía. ABC, supra; Bco. Central Corp. v. Capitol Plaza, Inc.*, 135 D.P.R. 760 (1994); *Mercado Cintrón v. Zeta Com. Inc.*, 135 D.P.R. 737 (1994); *Moa v. E.L.A.*, 100 D.P.R. 573 (1982). En consecuencia, al entender en una moción de desestimación, las alegaciones en la demanda cuya desestimación se solicita deben ser interpretadas conjuntamente y

liberalmente a favor del promovido.

Únicamente se desestimará la demanda si se demuestra que el demandante no tiene derecho a remedio alguno bajo cualesquiera hechos que pueda probar. *Moa v. ELA, supra*; *Candal v. CT Radiology Office, Inc.,* 112 D.P.R. 227, 231 (1982); *Cía. de Desarrollo Comer. v. American Fruits*, 104 D.P.R. 90 (1975). Cabe señalar, además, que *"no procede la desestimación definitiva de una demanda por dejar de exponer en la misma hechos que justifiquen la concesión de un remedio si dicha demanda es susceptible de ser enmendada."* *Clemente v. Depto. de la Vivienda*, 114 D.P.R. 763, 771 (1983).

En conclusión, todas las alegaciones en una demanda deben ser analizadas e interpretadas en conjunto y con el propósito de hacer justicia. El procedimiento, puro elemento formal, no debe utilizarse para derrotar derechos sustantivos de una parte. La demanda en particular, se interpretará de tal forma que únicamente se desestimará si el demandante no tiene derecho a ningún remedio bajo cualesquiera hechos que él pueda probar en juicio a base de lo que ha alegado en la demanda. *Moa v. E.L.A., supra.*

Por otro lado, una moción donde se formule esta defensa y se expongan materias no contenidas en la alegación impugnada o se acompañen documentos para sustanciar lo argumentado, deberá ser considerada como una solicitud de sentencia sumaria y estará sujeta a los trámites provistos en la Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36.

La Regla 36.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36.2, permite a una parte presentar una moción basada o no en declaraciones juradas, para que se dicte sentencia sumaria a su favor sobre la totalidad o cualquier parte de una reclamación. Por su parte, la Regla 36.3 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36.3, autoriza al tribunal a dictar sentencia sumaria cuando: 1) no existe controversia real sustancial en cuanto a ningún hecho material, y 2) como cuestión de derecho, debe dictarse sentencia sumaria a favor de la parte promovente. La sentencia sumaria solamente debe dictarse en casos claros, cuando el tribunal tenga ante sí la verdad sobre los hechos pertinentes, éstos no están en controversia, no hace falta una vista evidenciaria y el pleito sólo presenta una cuestión de derecho. *Soto v. Caribe Hilton*, 137 D.P.R. 294, 300 (1994); *Medina v. M.S. & D. Química P.R., Inc.,* 135 D.P.R. 716, 726-727 (1994); *Rodríguez v. Secretario de Hacienda*, 135 D.P.R. 219, 222 (1994); *Consejo de Titulares v. M.G.I.C. Financial,* 128 D.P.R. 538 (1991); *Tello v. Eastern Airlines*, 119 D.P.R. 83, 86 (1987); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 720 (1986).

La determinación de disponer de un pleito mediante este mecanismo es una que está confiada a la discreción del foro de primera instancia. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.,* 136 D.P.R. 881, 914 (1994). La parte que solicita la sentencia sumaria tiene que demostrar que no hay controversia real sustancial en cuanto a ningún hecho material y que procede se dicte sentencia a su favor como cuestión de ley. La parte opositora se ve entonces en posición de poner en controversia los hechos presentados por el promovente. *Pilot Life Ins. Co. v. Crespo Martínez,* 136 D.P.R. 624, 632 (1994).

Una vez la moción de sentencia sumaria ha sido presentada y se sostenga en la forma provista por la Regla 36 de las de Procedimiento Civil, *supra*, la parte contraria no puede descansar solamente en las aseveraciones o negaciones contenidas en su demanda, sino que viene obligada a contestar en forma tan detallada y específica, como lo hubiere hecho la parte promovente, exponiendo los hechos pertinentes a la controversia que demuestren que existe una controversia real que debe ser dilucidada en un juicio. De no hacerlo, debe dictarse sentencia sumaria en su contra, si procediere en derecho. Véase, la Regla 36.6 de las de Procedimiento Civil, *supra*; *PFZ Props., Inc. v. Gen. Acc. Ins. Co., supra*, a las págs. 912-913; *Pilot Life Ins. Co. v. Crespo Martínez, supra*, a la pág. 632.

Al dictar sentencia sumaria, el tribunal: (1) analizará los documentos que acompañan la moción solicitando sentencia sumaria y los documentos incluidos con la moción de oposición y aquéllos que obren en el expediente

del tribunal; (2) determinará si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. El tribunal no debe dictar sentencia sumaria cuando: (1) existen hechos materiales no controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; o (4) como cuestión de derecho no procede. *PFZ Props., Inc. v. Gen. Acc. Ins. Co., supra,* a las págs. 913-914.

Comencemos señalando que Copete presentó una solicitud de desestimación al amparo de la Regla 10.2 (5) de las de Procedimiento Civil, *supra.* En dicha moción, planteó, *inter alia,* que la reclamación de Fe-Ri descansaba en el alegado incumplimiento de un Acuerdo de No Competencia suscrito por las partes. Acompañó el escrito mencionado con dicho documento. Esto le permitió al Tribunal de Primera Instancia considerar la *"Solicitud de Desestimación"* como una solicitud de sentencia sumaria, quedando por ello sujeta a todos los trámites ulteriores prescritos por la Regla 36 de las de Procedimiento Civil, *supra*; *Sánchez v. Aut. de los Puertos,* 153 D.P.R. 559 (2001). No detectamos abuso de discreción por parte del tribunal *a quo,* al así actuar. A tono con lo anterior, nuestra revisión se dará dentro del contexto de una moción de sentencia sumaria.

Dicho lo anterior, en la situación de autos, el Tribunal de Primera Instancia determinó que el Acuerdo de No Competencia suscrito por Fe-Ri y Copete, no cumplía con los requisitos de razonabilidad de *Arthur Young & Co. v. Vega III, supra,* por lo que decretó que el mismo era nulo. ■

En Puerto Rico, como regla general, las partes contratantes tienen una gran amplitud al establecer las normas que regirán sus relaciones. Así lo establece el Art. 1206 del Código Civil de Puerto Rico, 31 L.P.R.A., sec. 3371, al expresar que un contrato existe desde que una o varias personas consienten en obligarse respecto de otras a dar alguna cosa, o prestar algún servicio. Sin embargo, la realidad es que este principio de libertad de contratación está limitado a aquellos actos que no sean contrarios a las leyes, la moral y el orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. *Véase, Plaza del Rey Inc. v. Registrador,* 133 D.P.R. 188 (1993); *García v. World Wide Entertainment Co.,* 132 D.P.R. 378, 384 (1992); *Col. Ing. Agrim. P.R. v. A.A.A.,* 131 D.P. R. 735, 766 (1992); *Hernández v. Méndez & Assoc. Dev. Corp.,* 105 D.P.R. 149, 153 (1976).

Siguiendo esta pauta, el Tribunal Supremo de Puerto Rico en *Arthur Young & Co. v. Vega III, supra,* a la pág. 175, enfrentándose a la validez de las cláusulas de no competir en los contratos de empleo, expresó que, tomando en cuenta que en nuestro ordenamiento rige el principio de la libertad de contratación, como regla general los acuerdos de no competencia son válidos, pero que, considerando que todo contrato debe estar conforme al principio de la buena fe, en ausencia de expresión legislativa al respecto, la validez de las cláusulas de no competencia dependerá del cumplimiento de ciertas condiciones.

En primer término, expresó el Tribunal Supremo que el patrono debe tener un interés legítimo en dicho acuerdo, esto es, de no recibir la protección de una cláusula de no competencia, su negocio se vería sustancialmente afectado. La magnitud de este interés se medirá, entre otras cosas, a la luz de la posición del empleado dentro de la empresa. Esto es, que la existencia del interés del patrono estará directamente relacionada y dependerá de que el empleado, por la posición que asume en la empresa, esté facultado para competir de forma efectiva con su patrono en un futuro. *Id.*

Segundo, el alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados. El objeto de la prohibición debe ser limitado a actividades similares a las efectuadas por el patrono; no es necesario que se limite a las funciones específicas del empleado. El término de no competencia no debe exceder de doce (12) meses, entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuadamente al patrono. Con relación al alcance de la prohibición, el contrato debe especificar los límites geográficos o los clientes afectados. En cuanto al área geográfica a la que aplica la restricción, ésta debe limitarse a la estrictamente necesaria para evitar la

competencia real entre el patrono y el empleado. Cuando la prohibición de competencia se refiere a los clientes, debe incluirse sólo a aquéllos que el empleado atendió personalmente durante un período razonable de tiempo antes de renunciar o en un período inmediatamente anterior a la renuncia, y que al hacerlo, todavía eran clientes del patrono. Estos elementos serán evaluados teniendo en mente la naturaleza de la industria involucrada y el posible interés público relacionado. *Id.*

Tercero, el patrono debe ofrecer una contraprestación a cambio de la firma del acuerdo de no competir por parte del empleado. Esta contraprestación puede consistir, por ejemplo, en la obtención de un ascenso, de beneficios adicionales en el trabajo o del disfrute de cambios sustanciales de similar naturaleza en las condiciones de empleo. Incluso, sería contraprestación suficiente que un candidato obtenga el empleo deseado en la empresa. Sin embargo, no será admitida como causa del acuerdo de no competencia la mera permanencia en el empleo. *Id.*

Cuarto, los pactos de no competencia, como todo contrato, deben contar con los elementos esenciales para su validez: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. *"Sin embargo, en este tipo de contratos, (los Tribunales) seremos especialmente estrictos al asegurarnos de que el empleado firmó libre y voluntariamente el contrato de no competencia. No permitiremos coacción o presión indebida alguna por parte del patrono."* Finalmente, es indispensable que los pactos de no competencia consten por escrito. *Id.*

En la medida en que estos contratos incumplan las anteriores condiciones, serán considerados, además de contrarios a la buena fe contractual, violadores del orden público por restringir de forma excesiva e injustificada la libertad de trabajo del empleado y la libertad de selección del público en general. Por tal razón, en vez de modificar la voluntad de las partes para ajustarla a normas razonables, se declarará nulo todo pacto de no competir que no cumpla con las anteriores condiciones. *Id. Véase,* además, *Aconi Telecommunications, Inc. v. Noa,* 136 D.P.R. 579 (1994).

Evaluadas las cláusulas de no competencia del Acuerdo suscrito entre las partes, a la luz de los requisitos establecidos por el Tribunal Supremo, tenemos que concluir que el mismo no cumple *a prima facie* con el segundo requisito por dos (2) razones. Veamos.

Una lectura del Acuerdo de No Competencia revela que el mismo se extiende por el término de veinticuatro (24) meses a partir de la renuncia, y de manera inconsistente más adelante señala que obligará a las partes por un espacio de diez (10) años contados desde la fecha de la terminación del empleo. Además de esta incongruencia en fechas, es evidente que ambas exceden el término de doce (12) meses establecido en el citado caso de *Arthur Young & Co. v. Vega III,* y por lo tanto resultan inapropiadas para proteger adecuadamente los intereses del patrono.

Asimismo, surge del Acuerdo de No Competencia una cláusula que dispone que la prohibición se extendería a un radio de ciento veinte (120) millas de la ubicación de Fe-Ri. Se ha señalado que la limitación territorial a la que aplica la restricción debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado. *Id.* Entendemos que el lenguaje de dicha cláusula es extremadamente amplio. Ante el lenguaje tan abarcador de la cláusula, debemos concluir que la misma excede de los márgenes de razonabilidad esbozados en *Arthur Young & Co. v. Vega III, supra.*

En el citado caso, el Tribunal Supremo fue enfático al señalar que la ausencia de alguno de los requisitos establecidos para la validez de las cláusulas de no competencia tendrá como consecuencia la nulidad del acuerdo. Al así determinarlo, expresó lo siguiente:

*"En la medida en que estos contratos incumplan con las condiciones anteriores, se considerarán, además*

*de contrarios a la buena fe contractual, violadores del orden público por restringir de forma excesiva e injustificada la libertad de trabajo del empleado y la libertad de selección del público en general.* **Por tal razón, en vez de modificar la voluntad de las partes para ajustarla a normas razonables, se declarará nulo todo pacto de no competir que no cumpla con las condiciones anteriores.**" (Énfasis suplido.)

*Id.*, a la pág. 177.

A la luz de lo anterior, y como bien apuntara el Tribunal de Primera Instancia, el Acuerdo de No Competencia suscrito entre las partes es nulo.

Por otro lado, Fe-Ri alega que Copete está impedido de levantar las limitaciones de *Arthur Young & Co. v. Vega III, supra,* como una defensa a la validez del contrato. Descansa su argumento en que la norma establecida en el citado caso está predicada en el derecho al trabajo, el cual no posee Copete en vista de que la visa por la cual se le autorizó a trabajar fue obtenida mediante fraude y conducta ilegal. Intima que por ser extranjero, a Copete no le aplican las protecciones constitucionales. Por tanto, concluye que las restricciones impuestas a los contratos de no competencia según el caso citado no son aplicables al caso de autos.

Meramente para fines de argumentación, como bien apunta Fe-Ri, compete a las autoridades federales determinar lo relativo a la visa de Copete. Sin embargo, no podemos aceptar la posición de Fe-Ri cuando sugiere que no apliquemos la jurisprudencia sobre los Acuerdos de No Competencia descansando meramente en este punto. Hacerlo así sería una intromisión indebida de este Foro en las relaciones contractuales de las partes.

Por último, es preciso señalar que *"la validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes."* Art. 1208 del Código Civil, 31 L.P.R.A. sec. 3372. Los contratantes pueden establecer *"los pactos cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral ni al orden público."* Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. En el caso ante nos, tanto Fe-Ri Construction como Copete estaban sujetos a las leyes de Puerto Rico al momento de suscribir el contrato y fue aquí donde otorgaron el mismo. Por tanto, quedan sujetos a las leyes de Puerto Rico y en ausencia de pacto en contrario son éstas las que rigen el acuerdo. Por tal razón, aplican con todo su vigor las limitaciones establecidas en *Arthur Young Co. v. Vega III, supra,* para ambas partes en el referido Acuerdo de No Competencia. Reiteramos, no incidió el Tribunal de Primera Instancia al decretar nulo el Acuerdo de Competencia suscrito a la luz del mencionado caso.

## IV

Sin embargo, nuestra determinación en cuanto a la nulidad del Acuerdo de No Competencia suscrito por las partes no dispone de este pleito. Hemos advertido que la moción para desestimar instada se convirtió en una solicitud de sentencia sumaria. Tan pronto se realiza la conversión, se activa el trámite y los requisitos exigidos por la Regla 36 de las de Procedimiento Civil, *supra.* Es bajo ese crisol que debemos evaluar la situación ante nuestra consideración.

Conforme reseñado, la citada Regla 36 de las de Procedimiento Civil dispone que se dicte sentencia sumaria cuando se demuestra que no existen hechos materiales esenciales en controversia y que ésta procede como cuestión de derecho.

El Tribunal Supremo ha apuntado que un acuerdo de no competir es incidental a un contrato de trabajo. *Arthur Young & Co. v. Vega III, supra.* A tales efectos, existen varias interrogantes en el caso de autos que impedían resolver el caso sumariamente.

En primera instancia, deseamos señalar que, al ser nulo el Acuerdo de No Competencia, no pueden subsistir aquellas causas de acción relacionadas al mismo. Sin embargo, lo anterior no significa que se puedan generar

otras causas de acción sobre otros aspectos no relacionados con las cláusulas de no competencia del Contrato de servicios suscrito entre las partes o que pudiesen generarse de un contrato de trabajo oral existente entre éstos. Veamos.

Como segundo señalamiento de error Fe-Ri plantea en su recurso que erró el Tribunal de Instancia al desestimar la causa de acción por violación de deber fiduciario. Arguye que el Acuerdo de No Competencia disponía que Copete podía realizar actividades de diseño y cobrarlas aparte, siempre que tales actividades no constituyeran competencia para la compañía, que toda actividad se realizara fuera de horas laborables y que no afectara su trabajo con la compañía.

No hay duda de que existe un relación de fiducia entre un director y la corporación, por lo que no debe tal oficial asumir posiciones contrarias a los intereses de la corporación. *Epstein v. F. & F. Mortgage Corp.*, 106 D. P.R. 211 (1977). Sin embargo, el Tribunal Supremo a señalado que a pesar de la naturaleza del puesto que ocupa, un director no está impedido de entrar en negocios similares, siempre que actúe de buena de y se abstenga de interferir con los negocios de la corporación. *Id.*

Utilizando tal principio de derecho como analogía, es necesario dilucidar en sus méritos si Copete suscribió otros contratos personales a su beneficio que afectaron sus funciones con Fe-Ri, conforme se alegó. Ante ello no se podía resolver tal controversia de manera sumaria.

En su tercer y cuarto señalamientos de error, Fe-Ri alega que incidió el Tribunal de Instancia al desestimar la causa de acción por competencia desleal. Fe-Ri plantea que el demandado Copete se valió de los clientes regulares de la empresa, de información confidencial, documentos y propiedad del apelante, y que de esta forma se aprovechó de su posición privilegiada para competir de forma desleal. En cuanto al alegado fraude, argumenta que: *"la conducta de fraude contra las autoridades de inmigración y contra la parte compareciente puede constituir una causa de acción civil por daños y ante la cual se pueden reclamar otros remedios de naturaleza civil"*. (Véase, pág. 20 del Alegato.) Sobre el primer punto, cabe consignar el proceso de aprendizaje y la información que un empleado adquiere en el ejercicio de sus funciones dentro de una empresa es inevitable, y no se justifica su prohibición. *Propane Gas Co. v. Ramos*, 95 D.P.R. 419 (1967). Sin embargo, hay alegaciones en la demanda que sugieren que Copete incurrió en fraude hacia su patrono. En atención a lo antes expuesto, esta controversia, por su naturaleza, no hace deseable o aconsejable el resolverlo mediante una sentencia sumariamente dictada. *Soto v. Hotel Caribe Hilton, supra.*

Nos plantea Fe-Ri que incidió el Tribunal de Primera Instancia al desestimar la causa de acción por interferencia torticera de relaciones contractuales. Fundamenta su alegación en dos hechos. El primero descansa en que Copete indujo a un contratista afiliado de Fe-Ri Construction a abandonar su acuerdo de no hacer trabajos para clientes o personas que hubieren contratado los servicios de la compañía. En segundo lugar, alegó que Copete intervino con clientes regulares del apelante para darles servicio, desconociendo éstos que se trata de un negocio separado y distinto. Argumentó que Copete incumplió con dichos clientes y no desempeñó cabalmente sus servicios, provocando que los referidos clientes se quejaran con el apelante, bajo la creencia de que el servicio fue prestado por la misma compañía.

Sobre el particular, se alegó en la demanda:

*"Como parte de su conducta ilegal y la obtención de información confidencial explotada para su beneficio, Copete ha intervenido con clientes regulares a los cuales Fe-Ri Construction le ha hecho trabajo y agresivamente ha procedido a darles servicio **al punto de que alguno clientes desconocen que se trata de un negocio separado**. Copete ya ha incumplido o no ha desempeñado cabalmente sus servicios, lo que ha resultado en quejas de clientes."* (Énfasis suplido.)

Véase, pág. 111 del Apéndice.

Observamos que al amparo de esta causa de acción podría existir un tercero o terceros afectados por la alegada intervención torticera de Copete. Véase, *Dennis, Metro Invs. v. City Fed. Savs.*, 121 D.P.R. 197 (1988).

La figura del contrato en daño de tercero, es análoga a la de interferencia torticera con una relación contractual. *Id.* En este caso, a las págs. 211 y 212, el Tribunal Supremo, citando a Díez–Picazo y Gullón, definió la figura de contrato en daño de tercero de la siguiente manera:

*"Se alude con esta denominación [contrato en daño de tercero] a las hipótesis en que al celebrar un contrato, y precisamente a causa de su celebración, los contratantes ocasionan un daño a una tercera persona, y ello tanto si son conscientes del mismo como si es uno de ellos el que exclusivamente desea o es consciente de la producción del daño."* (Citas omitidas.)

Para que exista un contrato en daño de tercero es necesario que concurran los siguientes requisitos: (1) que haya un tercero afectado, lo cual implica que es necesario que exista una incompatibilidad entre la posición jurídica del tercero afectado y la que se deriva del contrato celebrado; (2) que se haya causado un daño a esa tercera persona; (3) que medie un nexo causal entre el daño y el contrato, o sea, que la producción del daño tiene que ser una consecuencia directa e inmediata del contrato; y (4) que medie la intención de causar daño, ya sea de ambos contratantes o de uno solo de ellos. *Id.*

Aunque Fe-Ri fundamentó su reclamación en interferencia torticera con relación contractual, somos de opinión que ello no le impedía al tribunal *a quo* examinar las alegaciones de la demanda para determinar si Copete podía responderle a Fe-Ri bajo otros supuestos jurídicos, tales como la responsabilidad que se deriva del contrato en daño de tercero. En consecuencia, no procedía desestimar la demanda ante tales alegaciones.

Como sexto señalamiento, Fe-Ri plantea que erró el foro de instancia al desestimar la causa de acción por enriquecimiento injusto. Señala al respecto que Copete utilizó los recursos de Fe-Ri para su propio beneficio y no para el de la compañía y que se dedicaba en horas laborables a la explotación de su propio negocio. Consecuentemente, al continuar cobrando el sueldo de la compañía, Fe-Ri argumenta que Copete se enriquecía injustamente mientras él sufría el correlativo empobrecimiento provocado por el uso no autorizado de sus recursos.

La doctrina de enriquecimiento injusto es un principio general de derecho fundado en la equidad que aplica cuando la ley no ha previsto una situación en la cual se produce un desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento vigente. Para que se configure el enriquecimiento injusto tienen que cumplirse los requisitos de la doctrina. Estos son: (1) la existencia de un enriquecimiento, (2) un empobrecimiento correlativo, (3) la conexión entre el enriquecimiento y el empobrecimiento, (4) la falta de una causa que justifique el enriquecimiento, y (5) la inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa. No procede la aplicación de la doctrina cuando se obra de mala fe o cuando el aplicar la misma resulta contrario a una clara política publica plasmada en un estatuto o en la Constitución. *José Garriga Hijo, Inc. v. Condominio Marbella del Caribe Oeste,* 143 D.P.R. 927 (1997); *Ortiz Andújar v. E.L.A.,* 122 D.P.R. 817 (1998).

Para que prospere una acción bajo la doctrina de enriquecimiento injusto es preciso que se configuren y se prueben todos sus elementos. No basta con alegar la existencia de un enriquecimiento y un correlativo empobrecimiento patrimonial, como en efecto se limita a hacer el apelante en el presente recurso. Ciertamente, las alegaciones de una demanda pueden ser de carácter amplio y general; no obstante, para prosperar en una causa de acción basada en un enriquecimiento injusto, Fe-Ri debe probar que se cumplieron todos los elementos de la doctrina. Un análisis de los escritos que obran en el expediente demuestra que Fe-Ri no tuvo la

oportunidad de aportar prueba dirigida a demostrar que se cumplieron los elementos de la mencionada doctrina. Si consideramos el supuesto de que el contrato en su totalidad es nulo, Fe-Ri podría tener, a su vez, la reclamación bajo la doctrina de enriquecimiento injusto, conforme se alegó, entre otros que Copete realizó negocios para su propio beneficio utilizando su nombre. En resumen, no procedía desestimarse sumariamente la demanda sobre dichas alegaciones sustentadas en la doctrina de enriquecimiento injusto.

Fe-Ri arguye que incidió el Tribunal de Primera Instancia al desestimar la causa de acción por *culpa in contrahendo*. El Tribunal Supremo al analizar la doctrina de responsabilidad pre contractual o *culpa in contrahendo* ha señalado que es necesario considerar cuál es la figura jurídica -culpa, dolo, fraude, buena fe, abuso del derecho u otros principios generales del derecho- que responde más adecuadamente para la solución de un caso donde se alegue culpa *in contrahendo*. *Producciones Tommy Muñiz v. COPAN,* 113 D.P.R. 517, 530 (1982). En el citado caso se estableció que las negociaciones preliminares, generan una relación de carácter social que impone a las partes el deber de comportarse de acuerdo con la buena fe. Se considera como un hecho ilícito el rompimiento injustificado de las negociaciones, porque constituye un quebrantamiento de la buena fe, la cual penetra todo nuestro ordenamiento positivo. La buena fe impone a las partes un deber de lealtad recíproca en las negociaciones; por tal razón, la doctrina de culpa *in contrahendo* impone responsabilidad de tipo extracontractual a quien actúa culposa, dolosa o fraudulentamente durante los tratos preliminares.

Conforme la norma jurídica antes expuesta, basta con señalar que en el presente caso no se trata de tratos preliminares entre las partes. Es un hecho cierto que las partes realizaron un contrato de servicios, ya fuera escrito o verbal; por lo tanto, no aplica por definición la doctrina, la cual se refiere a negociaciones preliminares pre contrato. Procederá desestimarse dichas alegaciones y sus reclamaciones.

En su alegato, Fe-Ri expone como octavo error que incidió el foro de instancia al desestimar la causa de acción de daños y perjuicios. El Art. 1802 del Código Civil establece que el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. En su recurso, el apelante se limita a señalar que la conducta del apelado Copete le ocasionó daños y que en su demanda se establecieron todos los hechos constitutivos para una causa de acción al amparo del Art. 1802. No obstante, esta causa de acción está atada al resultado de las causas de acción anteriormente alegadas en el recurso. En consecuencia, no procedía la desestimación de esta causa de acción.

Como noveno error se señala que el tribunal *a quo* no consideró la *"Solicitud de Injunction Preliminar"* instada en la demanda. Argumenta que Copete, a través de su representante legal, remitió comunicaciones a clientes u organizaciones de Fe-Ri conteniendo información falsa con el propósito de interrumpir o trastornar las relaciones contractuales de Fe-Ri con sus clientes y dañar el buen nombre de la empresa. Por tal razón, solicitó al foro de instancia que emitiera un Interdicto Preliminar y ordenara al demandado: 1) devolver la información, documentos y propiedad del demandante que alegadamente retuvo y se abstuviera de utilizarla, 2) que cesara de dedicarse a negocios que compitan con las operaciones de la demandante por un período de un año, y 3) que desistiera de enviar comunicaciones escritas o verbales con información falsa a contratistas o personas relacionadas con el apelante.

La Regla 57 de las de Procedimiento Civil, *supra*, establece los procedimientos relativos a una orden de *Injunction* Preliminar, remedio provisional que se emite en cualquier momento de un pleito después de haberse celebrado una vista en que las partes han presentado prueba en apoyo y en oposición de tal solicitud. El propósito fundamental de un *Injunction* Preliminar es mantener el *status quo* hasta que se celebre el juicio en sus méritos, para que no se convierta en académica la sentencia que finalmente se dicte. *Municipio de Ponce v. Rosello,* 136 D.P.R. 776 (1994).

Los criterios que se deben considerar al momento de emitir un *Injunction* Preliminar son: 1) la naturaleza de los daños que puedan ocasionársele a las partes de concederse o denegarse el *injunction*, 2) su irreparabilidad o

la existencia de un remedio adecuado en ley, 3) la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo, 4) la probabilidad de que la causa se torne académica de no concederse el *injunction*, y 5) el posible impacto sobre el interés publico del remedio que se solicita. *Municipio de Ponce v. Rosselló,* 136 D.P.R. 776 (1994).

Alega Fe-Ri en su recurso que es patentemente claro que prevalecerá en los méritos de su reclamación; que la conducta de Copete le está causando daño irreparable, entre el cual se encuentra la pérdida de su buen nombre o plusvalía; y que su pérdida es mucho mayor que la incomodidad o inconveniente que pueda tener el demandado si se emite la orden.

Diferimos de los argumentos de Fe-Ri. En primer lugar, Fe-Ri solicitó que se le prohibiera a Copete dedicarse a negocios que compitan con las operaciones de Fe-Ri, y prohibirlo dedicarse a remodelar el interior de espacios comerciales. Somos de opinión que dicha petición es una excesivamente amplia que prácticamente le prohíbe a Copete ejercer su oficio, máxime cuando no media un Acuerdo de No Competencia. Es evidente que no se le puede prohibir a ningún ser humano que deje de ejercer el oficio que realiza para subsistir y ganarse el sustento. La naturaleza del daño que puede ocasionar el conceder un *Injunction* con una prohibición tan amplia sería una excesiva e irreparable. *PACIV v. Pérez,* 159 D.P.R. ___ (2003), **2003 J.T.S. 85**.

Por otro lado, en la demanda no se han alegado hechos suficientes conducentes a establecer que el promovente prevalecerá en las causas de acción alegadas, y no se ha demostrado que exista probabilidad de que la causa se torne académica de no concederse el *Injunction* solicitado. Finalmente, tendría un grave impacto sobre el interés público el conceder un *Injunction* que impida a un empleado desempeñarse dentro de la profesión que ha escogido, limitando sus capacidades o funciones a tal grado que coarten la libertad de un individuo a ejercer su profesión. *Id.* No incidió el Tribunal de Primera Instancia al negarse a expedir el *Injunction* Preliminar.

En conclusión, somos de opinión que el Tribunal de Primera Instancia incidió al desestimar las causas de acción sobre: competencia desleal, fraude, interferencia torticera, enriquecimiento injusto y daños y perjuicios.

## V

Por los fundamentos expresados anteriormente, se confirma la Sentencia apelada limitado a las cláusulas sobre no competencia del Acuerdo de No Competencia, las cuales son nulas en derecho y sobre la denegatoria de expedir el *injuction* preliminar y permanente. Se revoca la Sentencia apelada en cuanto a todas las demás reclamaciones conforme dispuesto en esta Sentencia. Se devuelve el caso al Tribunal de Primera Instancia a fin de que se continúe con los procedimientos en el caso de autos.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones