ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| JEANNETTE SOTO REALTY CSP<br><br>APELANTE<br><br><br>V.<br><br><br><br>RUBÉN DARÍO RIVERA MELÉNDEZ, CARMEN M. RIVERA Y LA SOCIEDAD LEGAL DE GANANCIALES<br><br>APELADOS | KLAN202400931 | *Apelación* Procedente del Tribunal de Primera Instancia, Sala Superior de Juana Díaz |
| | | Civil Núm.: SI2023CV00024 |
| | | SOBRE:<br>Cobro de dinero |

Panel integrado por su presidente el Juez Figueroa Cabán, el Juez Salgado Schwarz y el Juez Monge Gómez

Salgado Schwarz, Carlos G., Juez Ponente

# **S E N T E N C I A**

En San Juan, Puerto Rico, a 5 de diciembre de 2024.

Comparece ante nos Jeannette Soto Realty CSP ("Apelante" o "JSR"), quien nos solicita que revoquemos la Sentencia Sumaria emitida el 24 de septiembre de 2024[1] por el Tribunal de Primera Instancia, Sala Superior de Juana Díaz ("TPI" o "foro recurrido"). Mediante dicha Sentencia, el TPI declaró **HA LUGAR** la *Oposición a Petición de Sentencia Sumaria Presentada por la Parte Demandante y en Solicitud de Sentencia Sumaria a Favor de la Parte Demandada*.

-I-

A continuación, exponemos los hechos pertinentes ante nuestra consideración.

El 17 de febrero de 2022 Rubén Darío Rivera Meléndez y su esposa Carmen Rivera ("Apelados") suscribieron un

---

[1] Notificada el 25 de septiembre de 2024.

Número Identificador

SEN2024_____

contrato de corretaje en el cual contrataron los servicios de Jeannette Soto Realty a fin de vender su propiedad ubicada en el Barrio Canta Sapo en Santa Isabel.[2] Según surge del contrato el precio de venta de la propiedad era de $635,000.00 y el término era de 240 días.[3] A través de una publicidad de JSR, el señor Víctor Manuel Pérez López ("Sr. Pérez") advino en conocimiento de la propiedad en controversia y se comunicó con el señor Rubén Darío Rivera Meléndez ("Sr. Rivera"), ya que interesaba que unos familiares pasaran a ver la propiedad.[4]

El 14 de abril de 2022, Jeannette Soto Candelario ("Sra. Soto") se comunicó con el Sr. Rivera mediante mensaje de texto y le indicó que el Sr. Pérez enviaría una carta de pre-cualificación para comprar la propiedad, ya que la transacción se realizaría a través de un banco.[5] Ese mismo día, la Sra. Soto le envió un segundo mensaje de texto al Sr. Rivera titulado *Oferta de Compra* con fecha del 16 de abril de 2022.[6] Mediante dicha oferta, el Sr. Pérez y su esposa ofrecían la cantidad de $600,000.00 a fin de adquirir la propiedad.[7] Insatisfecho con la oferta, el Sr. Rivera le expresó a la Sra. Soto que el precio era fijo, por lo que no aceptaba los $600,000.00. A pesar de lo anterior, le indicó que estaba dispuesto a vender la casa con los muebles por la cantidad de $680,000.00.[8] La Sra. Soto le comunicó a los Apelados que el Sr. Pérez estaba dispuesto

---

[2] Véase Apéndice 23 del recurso apelativo, pág. 322.
[3] *Íd.*
[4] *Íd.*
[5] *Íd.*, a la pág. 107.
[6] *Íd.*
[7] *Íd.*
[8] *Íd.*

a comprar por $635,000.00 sin los muebles.[9] Al día siguiente, el Sr. Rivera le indicó a la Sra. Soto que había decidido no vender la propiedad al precio listado, sino que quería modificar el precio. Además, le indicó que declinara la oferta que habían presentado los posibles compradores.[10] Así las cosas, el 20 de abril de 2022, el Sr. Rivera se comunicó con la Sra. Soto y le indicó su interés de vender la propiedad por $975,000.00.[11] Ese mismo día, la Sra. Soto les envió a los vendedores una copia del Precontrato suscrito por los prospectos compradores por la cantidad de $635,000.00.[12] Sin embargo, como el Sr. Rivera no estuvo de acuerdo en vender por dicha cantidad, las partes decidieron cancelar el contrato de corretaje. Así las cosas, la Sra. Soto les indicó a los vendedores que no enlistaría nuevamente la propiedad por la cantidad de $975,000.00 hasta que se liquidara el contrato anterior.[13] Ante dicho escenario, el 7 de junio de 2022 el representante legal de los Apelados le envió una misiva a la Apelante solicitando conocer la cuantía de gastos incurridos desde febrero de 2022 hasta la cancelación del contrato de venta exclusiva. El 18 de julio de 2022, la Apelante contestó indicando que los honorarios estipulados corresponden al 4% del valor establecido, a saber $635,000.00.[14]

El 22 de febrero de 2023, la Apelante presentó la *Demanda*[15] de autos solicitándole a los Apelados pagarle

---

[9] *Íd.*, a la pág. 108.
[10] *Íd.*
[11] *Íd.*
[12] *Íd.* Cabe señalar que los apelados no suscribieron el Precontrato. Véase Apéndice #14 del recurso apelativo, pág. 109.
[13] *Íd.*, a la pág. 109.
[14] *Íd.*
[15] Véase Apéndice 55 del recurso apelativo, págs. 1034-1036.

la suma de $25,400.00 más el pago de intereses, honorarios y costas de litigio. En esencia, la Apelante alega ser acreedora de la comisión del 4% de la cantidad de $635,000.00. Dicha alegación se fundamenta en el acuerdo al que llegaron las partes, en el que el Sr. Rivera se obligó a pagar la comisión una vez la Apelante encontrara un comprador dispuesto, deseoso y en condiciones económicas de comprar o si la venta se efectuaba después de la terminación del contrato a alguna persona con la que la Apelante haya negociado durante la vigencia del contrato y así lo hubiera notificado a los Apelados. Como parte de sus alegaciones, la parte Apelante arguye que consiguió posibles compradores que se encontraban listos, dispuestos y capaces para comprar ("*ready*, *willing* and *able*") y que la propiedad no logró venderse por causas imputables a los vendedores.

El 8 de mayo de 2023, los apelados presentaron su *Contestación a Demanda*[16] solicitando que se declare "**No Ha Lugar**" la Demanda presentada. Además, alegaron que el contrato de corretaje es un contrato de adhesión que contiene una cláusula resolutoria que expresa lo siguiente: "*Si el PROPIETARIO desea cancelar la venta de su propiedad antes del término de este contrato pagará a JEANNETTE SOTO REALTY CSP los honorarios estipulados por concepto de consultoría, gastos publicitarios, gestiones y labores realizada [sic] en el momento de su cancelación verbal, escrita o falta de cooperación para la no realización de la transacción.*" Por lo tanto, alegan que en lugar de pagar los $25,400.00 (el 4% de

---

[16] Véase Apéndice 50 del recurso apelativo, págs. 1020-1025.

$635,000.00), lo que acordaron las partes fue que los vendedores tendrían que pagar por los gastos publicitarios, consultoría y honorarios en caso de cancelar el contrato de corretaje. Además, alegan los apelados que, al momento que los posibles compradores firmaron el Precontrato, no tenían la capacidad económica para adquirir la propiedad, toda vez que dependían de la aprobación de un financiamiento para lograr la compraventa. Por lo tanto, no se encontraban listos ni capaces ("*ready and able*") para adquirir la propiedad.

El 22 de febrero de 2024, la Apelante presentó una *Moción Para Que Se Dicte Sentencia Sumariamente*[17]. En esta ocasión, JSR alegó que los Apelados intentaron renegociar el precio de la propiedad luego de haber aceptado la compraventa por la suma de $635,000.00. Además, la Apelante señaló que, según surge del descubrimiento de prueba, el contrato incorporó la doctrina de "*ready, willing and able*". Finalmente, alega que una vez que JRS realizara la gestión de venta bajo los términos acordados, tiene derecho a recibir la comisión del 4%.

Oportunamente, el 13 de marzo de 2024, los Apelados presentaron su *Oposición a Petición de Sentencia Sumaria presentada por la Parte Demandante y en Solicitud de Sentencia Sumaria a favor de la Parte Demandada.*[18] En síntesis, alegaron que existen controversias de hechos sobre aquellos que la Apelante alega que no están en controversia. Además, los Apelados arguyen que la doctrina de "*ready, willing and able*" que utiliza JSR

---

[17] Véase Apéndice 34 del recurso apelativo, págs. 820-968.
[18] Véase Apéndice 32 del recurso apelativo, págs. 401-818.

como fundamento en su Demanda, no aplica al caso de autos. Lo anterior debido a que los posibles compradores no tenían el capital para comprar la propiedad, sino que dependían de la aprobación de un financiamiento que es un hecho futuro incierto.

Luego de múltiples trámites procesales, el 3 de junio de 2024, la Apelante presentó una *Moción Para Que Se Tome Conocimiento Judicial*[19]. En esta ocasión, JSR le solicitó al Tribunal que tomara conocimiento judicial sobre el hecho de que los posibles compradores adquirieron dos (2) propiedades en el barrio Las Cucharas de Ponce en el mes de noviembre de 2022, según surge de los documentos emitidos por el Sistema Karibe del Registro Inmobiliario Digital del Estado Libre Asociado de Puerto Rico y del catastro digital del Centro de Recaudaciones de Ingresos Municipales (CRIM). Al día siguiente, la Apelante presentó una *Moción en Cumplimiento de Orden*[20] alegando que la prueba contenida en el expediente sustenta el hecho de que los posibles compradores tenían una preaprobación de crédito que establece su capacidad para adquirir la propiedad en controversia mediante un financiamiento hipotecario. A tenor con lo anterior, el 6 de junio de 2024, los apelados presentaron una *Moción en Cumplimiento de Orden*[21]. En síntesis, alegaron que la compra de las propiedades en el barrio Las Cucharas de Ponce en noviembre de 2022 no es evidencia de que los compradores cumplan con la doctrina de "*ready, willing and able*". Lo anterior, debido a que el valor de dichas propiedades

---

[19] Véase Apéndice 22 del recurso apelativo, págs. 152-162.
[20] Véase Entrada #53 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[21] Véase Apéndice 17 del recurso apelativo, págs. 125-143.

sumaba la cantidad de $400,000.00, es decir, $235,000.00 menos de los fondos necesarios para adquirir la propiedad objeto de controversia.

A tenor con lo anterior, el 24 de septiembre de 2024, el TPI declaró **"HA LUGAR"** la *Oposición a Petición de Sentencia Sumaria Presentada por la Parte Demandante y en Solicitud de Sentencia Sumaria a Favor de la Parte Demandada* y desestimó la Demanda de autos.

Inconforme con la determinación del TPI, el 17 de octubre de 2024, la Sra. Soto presentó un *Recurso de Apelación* en el cual hizo el siguiente señalamiento de error:

> **ERRÓ EL TPI AL DICTAR SENTENCIA SUMARIA SIN ORDENAR EL PAGO DE LOS HONORARIOS ESTIPULADOS, LOS CUALES CONSISTEN DE UNA COMISIÓN DEL 4%.**

-II-

### A. Contratos

En nuestra jurisdicción el derecho de Obligaciones y Contratos se rige por las disposiciones del Código Civil.[22] Este cuerpo normativo dispone que el contrato es el negocio jurídico bilateral por el cual dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones.[23] Además, cabe señalar que, dentro del derecho contractual impera el principio de la autonomía de la voluntad, por lo tanto, es facultativo contratar o no hacerlo, y hacerlo, o no, con determinada persona.[24] Dentro del negocio jurídico, las partes pueden acordar cualquier cláusula que no sea contraria a la ley, a la moral o al orden público.[25] Así, el contrato se

---

[22] Ley Núm. 55 de 1 de junio de 2020, según enmendado.
[23] 31 LPRA § 9751.
[24] 31 LPRA § 9753.
[25] 31 LPRA § 9753; *Álvarez v. Rivera*, 165 DPR 1 (2005).

perfecciona una vez las partes manifiestan su consentimiento sobre el objeto y la causa, con excepción de los casos en lo que se requiere el cumplimiento de una formalidad solemne o cuando se pacta una condición suspensiva.[26] Por lo tanto, para que un contrato se considere perfeccionado y, por tanto, obligue a las partes a su cumplimiento, deben concurrir tres elementos, a saber: consentimiento, objeto y causa.[27]

Por otro lado, la regla general sobre la interpretación de los contratos se fundamenta en que, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes se estará al sentido literal de sus cláusulas. Ahora bien, si las palabras parecen contrarias a la intención evidente de las partes, prevalecerá la intención sobre lo expresado.[28]

**B. Cláusula resolutoria unilateral**

Las cláusulas resolutorias unilaterales son aquellas que le confieren a una sola de las partes la facultad de poner fin a la relación contractual. El Tribunal Supremo ha señalado que las partes pueden pactar una cláusula resolutoria unilateral, que le confiera a una sola de ellas la facultad de poner fin a la relación contractual por su mera voluntad, esto en perfecta armonía con el principio de *pacta sunt servanda*.[29]

**C. Doctrina del comprador dispuesto, deseoso y en condiciones económicas de comprar ("*ready, willing and able*")**

---

[26] 31 LPRA § 9771.
[27] *Oriental Bank v. Perapi, et al.*, 192 DPR 7, 15 (2014); *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 727 (2018).
[28] 31 LPRA § 6342.
[29] *Rodríguez García v. UCA*, 200 DPR 929, 943-944 (2018); *Mun. de Ponce v. Gobernador*, 136 DPR 776, 789 (1994); *Flores v. Municipio de Caguas*, 114 DPR 521, 529 (1983).

En Puerto Rico, el negocio de bienes raíces y la profesión de corredor de bienes raíces están regulados por la Ley Núm. 10 de 26 de abril de 1994, conocida como *Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico*.[30] El inciso (e) de la referida ley, define contrato de corretaje como "*aquél mediante el cual una persona, a cambio de una retribución, se obliga a prestarle servicios a otra como intermediario con un tercero para llevar a cabo una transacción de bienes raíces, según definida en esta Ley*."[31] El Tribunal Supremo de Puerto Rico ha establecido que el contrato de corretaje es de naturaleza *sui generis*. Si bien no está regulado por el Código Civil, al estar íntimamente relacionado con el contrato de mandato, se rige por las disposiciones del Código Civil referentes a dicha figura jurídica.[32]

Por otro lado, en el caso de *Torres v. Arbona Jr.*[33], nuestro más alto foro acogió la doctrina de "*ready, willing and able*". Dicha doctrina cobra vigencia cuando existe un conflicto en el perfeccionamiento de la compraventa. Si el corredor de bienes raíces encontró un comprador dispuesto, deseoso y en condiciones económicas de comprar, bajo los términos establecidos por el vendedor, tiene derecho a recibir la comisión pactada. Además, señala el Tribunal Supremo que cuando se pacta que la comisión queda supeditada a la consumación del contrato, el corredor de bienes raíces tendrá derecho a la comisión si la compraventa no se consumó debido a

---

[30] 20 LPRA sec. 3025 et seq.
[31] 20 LPRA § 3025.
[32] *Meléndez Guzmán v. Berríos López*, 172 DPR 1010, 1022-1023 (2008).
[33] *Torres v. Arbona Jr.*, 72 DPR 769, 778 (1951).

fraude, culpa o mala fe del vendedor o que al vendedor ya no le interese o se arrepienta de vender.[34]

-III-

En el presente caso, la Apelante alega que es acreedora de una comisión correspondiente al 4% de $635,000.00, toda vez que los Apelados se retractaron de vender la propiedad luego de esta haber encontrado un comprador *"dispuesto, deseoso y en condiciones económicas de comprar"*[35] (*ready, willing and able*). No le asiste la razón. Veamos.

Como parte de las cláusulas contractuales, las partes acordaron que *"si el Propietario desea cancelar la venta de su propiedad antes del término de este contrato pagará a Jeannette Soto Realty CSP los honorarios estipulados por concepto de consultoría, gastos publicitarios, gestiones y labores realizada [sic] en el momento de su cancelación verbal, escrita o falta de cooperación para la no realización de la transacción"*. Según se desprende del texto citado, la cláusula en cuestión es una de tipo resolutoria unilateral. Es decir, el propio contrato permite que el Sr. Rivera se retire del negocio jurídico si desiste de vender su propiedad. Ahora bien, en caso de optar por retirar su propiedad del mercado, este se compromete a pagarle a la Apelante los honorarios por concepto de consultoría, gastos publicitarios, gestiones y labores realizadas al momento de la cancelación del contrato. Dicha cláusula es clara y libre de ambigüedad, por lo

---

[34] *S.L.G. Rodríguez-Rivera v. Bahía Park*, 180 DPR 340, 367-368 (2010).
[35] Véase Apéndice #23 del recurso apelativo, pág. 322.

que debemos limitarnos al sentido literal de sus palabras.

Así las cosas, estando aún vigente el contrato de venta exclusiva, el Sr. Rivera desistió de vender su propiedad y así se lo informó a la Sra. Soto. Sin embargo, por entender la Apelante que había conseguido un comprador dispuesto, deseoso y en condiciones económicas de comprar alega ser acreedora del 4% de comisión. Ante dicho planteamiento, nos corresponde evaluar la doctrina del comprador dispuesto, deseoso y en condiciones económicas de comprar. Según surge del expediente, los posibles compradores llevarían a cabo la compra de la propiedad mediante un préstamo hipotecario. Sin embargo, en los autos del caso, no consta que estos tuvieran el préstamo aprobado. El documento que obra en el expediente es una pre-aprobación de LendUS que claramente indica: "*[T]his is not a committment to lend or a committment for a specific interest rate*"[36] Por lo tanto, según la prueba presentada los compradores no tenían la capacidad económica para comprar.

A pesar de lo anterior, JSR alega que los posibles compradores sí tenían la capacidad económica para comprar, toda vez que en noviembre de 2022 adquirieron dos propiedades en el municipio de Ponce, valoradas en $400,000.00. No le asiste la razón. El precio de venta de la propiedad en controversia fue $635,000.00, por lo tanto, existe una diferencia sustancial entre los precios de venta de las propiedades que nos impiden utilizar la compra de las propiedades en Ponce como fundamento para concluir que a los posibles compradores

---

[36] Véase Apéndice #32 del recurso apelativo, pág. 731.

les sería aprobado un préstamo hipotecario por la cantidad de $635,000.00. Tomar ese hecho como fundamento implicaría basar nuestro análisis en un hecho futuro incierto. Por lo cual, en el presente caso no se cumple la doctrina del comprador dispuesto, deseoso y en condiciones económicas de comprar, toda vez que la Apelante no pudo probar que sus clientes tenían la capacidad económica para adquirir la propiedad por $635,000.00. A tenor con lo anterior, concluimos que el señor Víctor M. Pérez López y su esposa, la señora Limary Bonilla, no configuran el comprador dispuesto, deseoso y en condiciones económicas de comprar que requiere la doctrina en situaciones como la de autos.

Ahora bien, en la medida en que el Sr. Rivera canceló la venta de la propiedad dentro del término de 240 días de vigencia del contrato, le corresponde pagarle a la Apelante los gastos publicitarios y de consultoría, junto con las gestiones y labores realizadas, según estipularon en el contrato de *Autorización de Venta Exclusiva*. A esos efectos, se le ordena al foro recurrido llevar a cabo una vista evidenciaria, en la cual la Apelante pueda presentar la documentación necesaria sobre los gastos incurridos durante la vigencia del contrato de corretaje.

-IV-

A la luz de los fundamentos antes expresados, se **confirma** la Sentencia apelada y se devuelve el caso al foro recurrido a los fines de que, según el contrato de corretaje, proceda la Apelante a acreditar los gastos incurridos que, en esencia, sean reembolsables de acuerdo con el contrato suscrito entre las partes.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


*Lcda. Lilia M. Oquendo Solís*
*Secretaria del Tribunal de Apelaciones*